**THREE RIVERS CABLEVISION, INC., and Matthew Moore, Plaintiffs,**

**v.**

**CITY OF PITTSBURGH and Warner Cable Corporation et al., Defendants.**

**Civ. A. No. 80–334.**

United States District Court, W. D. Pennsylvania.

Nov. 12, 1980.

---

Harold R. Schmidt, Pittsburgh, Pa., for plaintiffs.

Richard H. Martin, Joan P. Feldman, Marvin A. Fein, Associate City Sol., Virginia Cook, Asst. City Sol., Mead Mulvihill, Jr., City Sol., Pittsburgh, Pa., for defendants.

## OPINION

DIAMOND, District Judge.

This litigation arises out of the award by the city of Pittsburgh (city) of a cable television contract for which several companies, including plaintiff Three Rivers Cablevision, Inc. (Three Rivers), were bidding. Plaintiffs, Three Rivers and one Matthew Moore, a party to a stock subscription agreement by which he would have become a shareholder of Three Rivers if the latter had been awarded the aforesaid contract, filed this suit under 42 U.S.C. § 1983, § 1985, and the Fifth and Fourteenth Amendments of the United States Constitution alleging that they were the victims of various civil rights deprivations committed during the bid procurement and award process. A pendent state law claim is also asserted. Named as defendants are Warner Cable Corporation of Pittsburgh (Warner), the company to which the contract was awarded, and a group of defendants

consisting of the city, the city council (council), and the mayor and eight of the nine individual members of city council sued in their representative capacity (municipal defendants).

Plaintiffs' primary complaint is that as a result of a preconceived and unlawful preference, Warner was awarded the contract despite material deficiencies in its bid. In count I plaintiffs allege that this conduct violated their Fifth and Fourteenth Amendment rights to due process and equal protection of the laws as well as certain provisions of Pennsylvania law which require that contracts of this type be awarded to the lowest responsible bidder, 53 P.S. § 23301 and Article V § 3 of the City Home Rule Charter. In addition to the alleged deficiencies in the Warner bid, plaintiffs also claim that certain bid specifications designed to encourage minority involvement in bidding companies and which allegedly were the sole basis for the city's selection of Warner over the other bidders, were so conflicting, vague, and indefinite as to violate plaintiffs' right to due process and equal protection.

Presently before the court are separate motions to dismiss filed by both the municipal defendants and Warner. The bases for these motions, which are varied, sometimes complex, and often overlapping and redundant, are more fully detailed later herein. For the reasons set forth below, the court will grant the motions with regard to count I insofar as they seek dismissal for failure to state a claim under § 1985(3), the Fifth Amendment, and the Fourteenth Amendment, and with regard to count II insofar as the municipal defendants seek partial summary judgment. In all other respects the motions will be denied.

## I. FACTUAL BACKGROUND

When considering motions to dismiss we must take as true the well–pleaded allegations of the complaint. *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Lasher v. Shafer*, 460 F.2d 343 (3rd Cir. 1972). Those allegations pertinent to the instant matters now before us may be summarized as follows.

Following a review of separate reports prepared by one of its subcommittees and a privately retained expert consultant, council decided to solicit bids for a cable television system for the city. Council began with the adoption of Ordinance No. 20 entitled "Cable Communications Ordinance" (CCO). The principal purpose of the CCO was to regulate the construction, operation, and maintenance of a cable television system in the city by contract with a franchisee, and thus it provided the basic contract terms and specifications to be met by prospective bidders. In July of 1979 the city's Department of Public Works formally solicited bids by issuing a Request for Proposals (RFP). Among other things, the RFP provided that all bids must meet the construction and service specifications set forth in the CCO and that all bidders submit their bids to the city no later than October 1, 1979. In meetings with officials of the city solicitor's office and the Bureau of Cable Communications, a sub–division of the city's Department of Public Works, the prospective bidders were advised emphatically that all bids must comply in every detail with the CCO and that under no circumstances would opportunities for amendment be provided. The CCO as well as the RFP provided that any bid which failed to furnish any information required thereunder would be rejected without further consideration.

By the deadline of October 1, 1979, the city had received bids from four companies: Three Rivers, Warner, Community Cablevision, and Allegheny Cablevision, Inc. All four bids, however, were rejected on that day for failure fully to comply with the CCO. In this regard, plaintiffs allege that while Three Rivers' noncompliance related to a "technical requirement" concerning a surety bond, Warner's "... proposal was grossly deficient and did not comply in material and significant respects with the Cable Communications Ordicance (sic)." (¶¶ 27, 28 of plaintiffs' complaint). The four companies which had submitted timely bids were then given until October 25, 1979, to submit new proposals. Again the bid-

ders were admonished by the Bureau of Cable Communications and the city solicitor that no amendments would be permitted.

Plaintiffs then allege that Three Rivers' second proposal fully complied with the CCO and RFP, whereas Warner's again contained several material deficiencies. Thereafter, beginning in November of 1979, certain unidentified employees of the Bureau of Cable Communications allegedly held private meetings with Warner, the effect and purpose of which were to provide Warner with an unfair advantage over the other bidders by advising Warner of the deficiencies in its second bid so that it could correct them by amendment. Subsequently, Warner was permitted to correct at least one of these deficiencies which, according to plaintiffs, was as significant as the technical one for which the initial proposal of Three Rivers was rejected.

On January 30, 1980, council by a vote of 8–1, passed a resolution authorizing the award of the contract to Warner. Plaintiffs contend that this action was in complete disregard of the recommendation made by the two bodies charged with submitting bid evaluations to council, the Bureau of Cable Communications and the Cable Communications Advisory Committee, that the contract be awarded to Three Rivers. In addition, plaintiffs complain that the resolution completely ignored the fact that Warner's proposal still contained disqualifying deficiencies. Plaintiffs further allege that the award of the contract to Warner was in fact the result of a preconceived plan to favor Warner and to make a sham of the entire bidding process. And finally, plaintiffs assert that the city's sole proffered reason for the selection of Warner; viz, its supposedly superior program for minority involvement, is infirm since the specifications regarding that program were unconstitutionally vague and conflicting.

Defendants seek dismissal of the complaint on various grounds. They challenge counts I and II, the constitutional claims, under Rule 12(b)(1), (6), and (7), Fed.R. Civ.P., for lack of subject matter jurisdiction, failure to state a claim, and failure to join persons needed for just adjudication under Rule 19. In support of both the 12(b)(1) (subject matter jurisdiction) and 12(b)(6) (failure to state a claim) bases for dismissal, the defendants contend that plaintiffs 1) lack standing to assert the constitutional claims raised; 2) had no recognized due process or equal protection interest at stake; 3) have failed to plead that the deprivations allegedly visited upon them were, in the municipal defendants' case, done pursuant to some official policy or, in Warner's case, under color of state law; 4) have failed to plead their constitutional claims with sufficient specificity; 5) have failed to state causes of action under § 1985, and the Fifth and Fourteenth Amendments; 6) are in any event entitled to no relief because of defendants' absolute legislative immunity.

In support of their 12(b)(1) argument, defendants invoke the doctrine of abstention and contend that the court should refuse to entertain this case. As to the 12(b)(7) motion, defendants maintain that the two remaining bidders on the instant contract, Community Cablevision and Allegheny Cablevision, Inc., are indispensable parties whose absence on the record necessitates dismissal of the case. The defendants have moved to dismiss count III, the pendent state claim, on the ground that since plaintiffs have failed to state viable constitutional claims under counts I and II, the state law claim must be dismissed for lack of jurisdiction.

Many of these grounds obviously are redundant or overlapping, particularly where they are raised in support of both the failure to state a claim and the lack of subject matter jurisdiction bases. Therefore, while ultimately we shall deal with the substance of all of defendants' points, we have framed the questions in broad comprehensive categories and have not attempted to respond seriatim to the issues as expressed by the defendants in their motions or briefs. Accordingly, we discuss the abstention question in Part II, in Part III we deal with the various dismissal bases as they relate to the

count I claim regarding the alleged deficiencies of Warner's bid, and in Part IV we dispose of the dismissal bases as they relate to the count II claim dealing with the allegedly vague and conflicting minority involvement specifications.

## II. ABSTENTION

■ The threshold question before us is one of abstention. The defendants urge that we decline to entertain this suit because it raises difficult and unsettled questions of state law and that the controversy is of such unique local concern that the state courts are a more proper forum for its resolution. We decline to abstain.

Our analysis commences with the premise that "[a]bstention from the exercise of federal jurisdiction is the exception, not the rule," *Colorado River Water Conservation District v. U. S.*, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976), and that the doctrine should be invoked "only in exceptional circumstances where the order to the parties to repair to State court would clearly serve an important countervailing interest." *County of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 79 S.Ct. 1060, 3 L.Ed.2d 1163 (1959). The courts which have ordered abstention usually have done so on one of three grounds, two of which are relevant here: 1) that there exists an unsettled question of state law, the resolution of which by state courts would make unnecessary, or substantially affect, the ultimate resolution of a federal constitution issue, or 2) that the controversy involves an issue of unique state concern having broad policy implications.[1] These two types of abstention are sometimes referred to by the names of the cases from which they were cast, *Railroad Commission of Texas v. Pullman Co.*, 312

U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), and *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), respectively. Accordingly, we shall examine the instant dispute in terms of *Pullman* and *Burford* –type abstention.

In *Pullman* the petitioner and certain railroad companies obtained a lower court injunction enjoining the Texas Railroad Commission from enforcing one of its orders relating to the assignment of porters on sleeping cars. The order was objected to on constitutional and state law grounds. Without reaching the federal constitutional issue, the district court found that the order was invalid on state law grounds; viz., that the Commission lacked the authority under local law to issue it. The Supreme Court reversed, holding that because the case could be decided on state law grounds and the relevant state law was subject to conflicting interpretations the district court should have stayed its hand while the parties petitioned the readily available state court for an authoritative ruling. Otherwise, said the Court, depending on its ruling regarding the state law question, the district court not only could be adjudicating prematurely a constitutional issue, but also might be rendering an unnecessary forecast of state law which could thereafter be supplanted by an authoritative ruling.

*Pullman* –type abstention has been invoked often by the Court. *See* cases at Wright & Miller, Federal Practice and Procedure (*Wright & Miller*) Civil § 4241 n.24, and 1A Moore's Federal Practice, (*Moore*) p. 2103 at n. 8. It also has been applied by the Third Circuit, which in *D'Iorio v. County of Delaware*, 592 F.2d 681 (3rd Cir. 1978) held that abstention was required where uncertainty existed under state law as to

---

1. The third common ground, sometimes referred to as the separate doctrine of "Our Federalism," is invoked to prohibit disruption of an on going state judicial proceeding. *See generally, Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and Wright & Miller, Federal Practice and Procedure: Civil §§ 4251–55. That, of course, is not involved here.

Admittedly, not every abstention case can be fitted neatly into one of these designated cate-

gories. However, the Court has referred to these three general grounds for abstention even where its ultimate basis for favoring abstention has been some other factor, such as judicial economy. *See Colorado River, supra*, 424 U.S. at 813–16, 96 S.Ct. at 1244–1246. At any rate, the first two categories mentioned are the most relevant to the instant case and are, in fact, the ones raised by the parties.

whether plaintiff had tenure rights in his job and, therefore, whether he had a Fourteenth Amendment property interest in the position.

■ There are two essential prerequisites to the application of the *Pullman* doctrine: 1) the existence of an unsettled question of state law, and 2) the likelihood that an alternative construction of that law will make unnecessary, or substantially affect, the ultimate resolution of a federal constitutional question. *Colorado River, supra*, 424 U.S. at 814, 96 S.Ct. at 1244–1245, and 1A *Moore* ¶ .203[1].[2] In regard to the latter requirement, it has been said that the state law normally must be so uncertain as to be "fairly subject" to differing interpretations. *Wisconsin v. Constantineau*, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971); *Zwickler v. Koota*, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967). In total, the *Pullman* doctrine is a carefully molded accommodation of three fundamental jurisprudential principles; namely, that a federal court is obliged to resolve cases which are properly before it; that decisions on constitutional bases should be avoided when possible; and that friction between the state and federal systems should be minimized. 1A *Moore* ¶ .203[1].

Applying the *Pullman* doctrine to the instant case, we conclude that abstention on that basis is not appropriate. Neither the defendants' brief nor our independent examination of the issues and research of the law convinces us that this case presents novel and unresolved questions of Pennsylvania law. As set forth more fully below,[3] the state law with regard to the awarding of governmental contracts is quite clear: the contract must be awarded to the lowest responsible bidder, and in determining who in fact is the lowest responsible bidder the awarding authority must exercise its discretion in a non–arbitrary fashion.

The municipal defendants suggest as an area of uncertainty a refinement of the law relating to public contracts; that is, the degree of non–compliance with contract specifications which a bid must evidence before it will be deemed so materially defective as to warrant rejection. We disagree that this raises a question of uncertain state law, for it appears to us that it is resolved with relative certainty. If plaintiffs prove their allegation that, either as a result of some language in the specifications or because of discussions had with city officials, all bidders were informed that to avoid rejection they must comply with even the most minute details of the CCO and RFP specifications, then the standard for rejection is quite specific and definitive. If plaintiffs fail so to prove, then the general rule would apply, and non–compliance would cause rejection only if it was of such a degree as to render the bid "non–irresponsible," *Cf. Book v. Hall*, 339 Pa. 470, 15 A.2d 355 (1940), and that too presents a reasonably certain standard.

Finally, the defendants argue in support of *Pullman* abstention that the state courts never have been given an opportunity to pass upon the question of who was the lowest responsible bidder here. This contention fundamentally misconceives the nature of the principles underlying abstention. The issue in an abstention case is not so much whether the dispute *can* be resolved in a state forum (assuming one is available), but rather whether for some special reason a federal court *cannot*, or *should not*, resolve it. *Cf. Wright & Miller*: Civil § 4242 and cases at n. 26. And the special reason that must be present, the *sine qua non* of *Pullman* abstention, is an *uncertain* issue of state law. 1A *Moore* p. 2106. No such uncertainty having been established here, we deny the request for *Pullman* abstention and need not reach the secondary question of whether a state court ruling on uncertain issues might substantially affect or render

**2.** A third implicit prerequisite is the existence of a state forum for review, for obviously if there is no state court available to render an authoritative determination there is reason not to abstain. *Hillsborough Township v. Crom-* *well*, 326 U.S. 620, 66 S.Ct. 445, 90 L.Ed. 358 (1946).

**3.** *See* text, *infra*, pages 1131 1132.

unnecessary the resolution of federal constitutional questions.

We consider now the second general type of abstention relevant to the instant case, the so–called *Burford* abstention. In *Burford* the Supreme Court ruled that abstention was properly invoked where an oil company attacked on constitutional grounds the validity of a Texas Railroad Commission order permitting *Burford* to drill oil wells in an approximately 280 sq. mile oil tract or "pool." The Court so ruled because the controversy directly implicated the formulation of broad economic and social policy of that state. Specifically, the Court alluded to the profound impact of oil production and allocation on the economy and the conservation efforts of the state; the geologically–based necessity of regulating single wells only vis–a–vis an entire pool; and the state's decision, therefore, to establish a special judicial network whereby all matters of this nature would be brought first before the Commission and thereafter appealed to a specially designated state district court. Under these circumstances the Court held that to retain control of the dispute in a federal court, with its comparative lack of expertise and its likelihood of rendering a judgment inconsistent with prior or future state pronouncements, would upset the carefully structured attempt of Texas to deal wisely and uniformly with a matter of basic state policy.

*Burford*–type abstention also has been invoked by the Court where a party attacked a state regulatory order regarding cessation of railroad service. In that case the Court found that abstention was proper since the state had established a special state–wide review process to resolve the "essentially local problem" of regulating intrastate transportation service, which required one to balance the needs of the public against the economic interests of the railroad. *Alabama Public Service Commission v. Southern Railway Co.*, 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002 (1951). The Third Circuit also has sanctioned abstention on this ground in an action by an airline to enjoin enforcement of a state public utility commission rule requiring it to obtain commission approval prior to discontinuing certain flights. *Allegheny Airlines, Inc. v. Pennsylvania Public Utility Commission*, 465 F.2d 237 (3rd Cir. 1972). The basic rationale in *Allegheny Airlines* was that the controversy involved state–wide transportation matters which the Pennsylvania Public Utility Commission had the responsibility to regulate in the public interest, and that to reach the merits of the airlines' contention while the airline refused to re–institute service might throw the state into chaos by encouraging other airlines to follow suit. Conversely, in a diversity action in assumpsit to recover payment for the sale of milk, this Circuit refused to order abstention where referring the matter to the state milk marketing board would further no *Burford* interest. Specifically, the court noted that the suit involved nothing within the special discretion or expertise of the state board; that it did not involve the formulation of state policies; that it did not interfere with a matter presently before the board; and that it was essentially a dispute between two private parties. *Baltimore Bank, Etc. v. Farmers Cheese Corporation*, 583 F.2d 104 (3rd Cir. 1978).

The principal element in *Burford* abstention is the implication of state interests, and in *Colorado River, supra*, one of its more recent decisions in the area, the Court indicates how very substantial the effect of federal court action thereon must be to invoke *Burford* abstention. The *Colorado River* case involved an action by the United States seeking a declaration of its rights under federal and state law in certain Colorado rivers and streams. Despite the Court's recognition that probably "no problem of the Southwest section of the Nation is more critical than that of the scarcity of water," 424 U.S. at 804, 96 S.Ct. at 1239; that Colorado had specifically established an elaborate regulatory scheme for adjudication of water rights disputes; that the United States itself had utilized said scheme in the past; and that the water rights established under federal law might conflict with those prevailing under state law, the Court held that state interests

were not sufficiently implicated to justify abstention.[4] As Professor Moore states, *Colorado River*, when compared with the earlier holding in the less, or at best equally, compelling case of *Southern Railway, supra*, makes it clear that *Burford*–type abstention is proper "only when there are truly exceptional circumstances 1A *Moore* p. 2130. At the very least, it suggests that the Court is becoming less receptive to pleas for abstention on that basis.

Applying *Burford* and its progeny to the case at bar, we conclude again that abstention is inappropriate. There are material distinctions between the instant case and those in which the courts have invoked the *Burford* doctrine. First, and perhaps most conclusively, this case lacks the crucial element of *Burford* abstention that the controversy be one "whose importance transcends the result in the case at bar," by reason of its effect on state policy in an area of substantial public concern. *Colorado River, supra*, at 814, 96 S.Ct. at 1244–1245. Here, unlike *Burford* and *Allegheny Airlines*, where a state's entire policy regarding oil production and air transportation respectively were at issue, the defendants point to no particular state–wide policy or program which has been drawn into question. As important as it may be locally, this controversy appears simply to have no material impact on any matter beyond the installation of cable television in the City of Pittsburgh, and if the converse be true, the defendants certainly have not established it.[5]

Another basic difference between the case *sub judice* and *Burford, Southern Railway*, and *Allegheny Airlines*, lies in the fact that Pennsylvania has created neither a public agency to deal particularly with the regulation of cable television service nor a special system of judicial review for those

**4.** The Court did abstain ultimately for reasons of judicial economy.

**5.** Defendant Warner seeks to support its abstention argument by citing several F.C.C. cases which in very general terms state that alleged constitutional violations occurring during procurement of cable television bids are matters for local courts. *See*, for example, *In re Application of Sentinel Communications*, 47 F.C.C. 420 (1974); *In re Application of International Telemeter*, 47 F.C.C. 469 (1974); *In re Application of Warner Cable*, 30 P. & F. Radio Reg.2d 1206 (1974). But given the context of those statements and the nature of F.C.C. authority, those cases are not persuasive.

Typically there, competing bidders would oppose an awardee's application to the Commission for a certificate of compliance on numerous grounds, one of which would relate to alleged violations of general due process requirements in connection with the contract award. A certificate of compliance, which until 1976 had to be obtained before a franchisee could commence operation, 47 C.F.R. § 76.11 (1976 ed.), certified to all concerned that the applicant was in conformity with relevant F.C.C. rules and practices relating to cable television systems. In the course of disposing of an opponent's generally lengthy list of objections to the application, the F.C.C. would sometimes state that if an opponent wished to raise questions of constitutional law violations, "the proper forum for such a challenge is not before this Commission but rather through local judicial process." *Sentinel Communications, supra*, at 423.

The F.C.C., like other administrative agencies, is generally concerned with relatively narrow, technical matters entrusted to it and, specifically in the cases cited by Warner, the compliance of cable television franchisees with F.C.C. rules. This is clear from the statements by the Commission in these cases that while it required franchise agreements to recite that a due process hearing was held regarding the technical qualifications and adequacy of the proposed system, 47 C.F.R. § 76.31 (1976 ed.), the Commission would not look behind a franchise agreement that so recited, *International Telemeter, supra*, at 472, and that it did "not intend to act as a court of last resort" for disgruntled bidders, but rather would generally presume that a hearing in accord with due process was held where local officials so assure them. *Sentinel, supra*, at 422.

With that, we believe that the F.C.C.'s reference to "local judicial process" is more appropriately viewed as a signal to the litigants that questions of constitutional proportions should not be thrust upon an administrative agency of limited jurisdiction and purpose so as to turn a certificate of compliance dispute into "a federal case," but rather should be raised in more traditional courts of general jurisdiction. And we read those cases as expressing no view as to which of the two traditional jurisdictions–federal or state–is the more appropriate for that purpose, since their references to "local" have been anything but the culmination of detailed discussions on federal/state relations or the public policy of implications of franchising cable television.

allegedly aggrieved by governmental action regarding such service.[6] We recognize that creation of such bodies is not an absolute prerequisite to the establishment of *Burford* abstention, *See Wright & Miller*: Civil § 4244, but it is an additional indication that to this point the state itself has not viewed the regulation of cable television systems as a matter of general public concern or one which requires the expertise of a specialized regulatory agency.

In the final analysis, it appears that the defendants' argument for abstention rests almost exclusively on the fact that the installation of this system is a matter of keen public interest. But the gravamen of *Burford* abstention is the implication of public *policy*, which is, of course, to be distinguished from public *interest*. The defendants have failed to identify any legitimate and substantial public policy at issue here, nor is the court able to perceive any such considerations which exceed or even equal the seemingly substantial ones considered but deemed insufficient in *Colorado River*. Thus, is not a "truly extraordinary" situation calling for the exceptional remedy of abstention.

There is an additional factor, though less significant than those considered above, which militates against abstention on either *Pullman* or *Burford* grounds. That is the matter of undue delay. *See* cases at *Wright & Miller*: Civil § 4242 n.49.

Under the terms of the CCO, the franchisee is obligated to proceed with construction and installation of the system according to a rather detailed time table, and § 8.1(f) of the franchise agreement executed by Warner and the city specifies that

"any litigation instituted by a third party shall not suspend franchisee's obligation to construct and install the system in accordance with the [said] time schedule . . . ." If Warner is engaged in construction and installation work, it is fair to assume that should the contract be declared void that some of that work will have been wasted. In addition, Three Rivers claims that it may be irreparably prejudiced by Warner's on–going installation efforts.[7]

Thus, the longer the resolution of this matter is delayed, the greater the potential harm to both companies and the public. In view of the fact that no state proceeding has yet been commenced, it is likely that our abstention would delay the ultimate disposition of this case for more than an immaterial period. If this was the only matter weighing against abstention, it would not be sufficient, but in conjunction with the other bases which we have expressed, the matter of prejudicial delay is further support for our belief that abstention is wholly inappropriate.

Accordingly, the request that this court abstain while plaintiffs pursue remedies that may be available in the state courts will be denied.

### III. COUNT I: THE ALLEGED WARNER DEFICIENCIES

The action of council in awarding the cable contract to Warner notwithstanding the alleged deficiencies in its bid forms the basis of plaintiffs' due process and equal protection claims under § 1983 and § 1985, and under the Fifth and Fourteenth Amendments. Collectively those claims

---

6. The municipal defendants argue that under 2 Pa.C.S.A. § 752 plaintiffs could have filed an appeal from council's decision on the contract. That is true, but § 752 does not purport to provide an appeal mechanism special or unique to cable television controversies. On the contrary, that section provides generally for appeals from any adjudication of a local agency and not just those arising out of cable television matters. In addition, under 42 Pa.C.S.A. § 933(a)(2) those appeals are heard by courts of general jurisdiction, viz., the courts of common pleas. All of which is in contrast to the operative facts found to be significant in *Burford*. In

short, Pennsylvania provides no special judicial or administrative trial or appeal process for disputes over cable television matters.

7. In support of a motion to lift the stay on discovery imposed during the pendency of the instant motions, Three Rivers alleged, inter alia, that while undertaking its installation efforts Warner may be acquiring rights–of–way and exhausting limited governmental funds which could make installation by Three Rivers more difficult should it eventually obtain the contract.

comprise count I of the complaint. Their essence may be drawn from ¶ 63 thereof which states:

> "The action of Council in considering the materially deficient Warner proposal and awarding the franchise for the cable communications system for the City of Pittsburgh to Warner based on arbitrary, capricious, unlawful and irrelevant considerations unfairly deprived plaintiffs of due process and equal protection of laws ...."

### A. The Statement of a Due Process Claim Under § 1983

██ It is clear from the language of the Fourteenth Amendment that to make out a claim for denial of procedural due process one must assert and prove that he unjustly was deprived of a protected liberty or property interest. The plaintiffs' primary contention appears to be that the protected interest of which they were deprived was a property right to have the cable television franchise awarded in accordance with the mandates and requirements of the CCO and the RFP. This will be examined further after a review of the relevant precedent.

We first consider the concept of the protected liberty or property interest. Current analysis in the procedural due process area employs the so–called "entitlement doctrine" as opposed to the former, more rigid, "rights/privileges" concept.[8] In the modern analysis, which was articulated principally in *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), both liberty and property interests are seen as emanating not only from the Constitution, but also from state or federal statutory schemes and customs which create legitimate claims of entitlement to the benefits which they confer. With regard to property interests, the *Roth* Court stated at p. 577, 92 S.Ct. at p. 2709:

> ... To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it....
>
> Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law–rules or understandings that secure certain benefits and that support claims of entitlement to those benefits....[9]

In *Roth* the Court held that a college instructor who could point to no guarantee of continued employment, either in his con-

---

**8.** Under the rights/privileges approach it was generally held that while one could not be denied without due process a right granted expressly or impliedly in the Constitution, one could be deprived of one of the many personal benefits conferred on citizens by various government programs and statutes. The former group of benefits were thought to be true "rights" since they emanated directly from the Constitution, while the later group consisted of the mere "privileges" of living in modern society. *Bailey v. Richardson*, 182 F.2d 46 (D.C.Cir. 1950) aff'd, 341 U.S. 918, 71 S.Ct. 669, 95 L.Ed. 1352 (1952). However, the inquiry now centers more on a legitimate claim of entitlement based on the circumstances surrounding the acquisition of the interest than it does on the existence of a definite constitutionally conferred right.

**9.** It has been suggested that in addition to the "legitimate claim of entitlement" a second factor must be established in order to assert a due process claim; namely, present enjoyment of the benefit. *See Nowak*, "Constitutional Law"

(1978), p. 491–494. Thus, one may advance the proposition that while a person may not be discharged from a particular job without due process, his initial attempt to acquire that job could be rebuffed arbitrarily. While there is language in *Roth, supra*, suggesting as much ("the Fourteenth Amendment's procedural protection of property is a safeguard of the security interests that a person has *already acquired* in specific benefits," (408 U.S. at 576, 92 S.Ct. at 2708) (emphasis added), the Supreme Court has never addressed this issue squarely. We note, however, that recent holdings of both the Court and the Third Circuit indicate that present enjoyment is not a necessary factor in establishing a due process interest. *See, Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979) and *Winsett v. McGinnes*, 617 F.2d 996 (3rd Cir. 1980), discussed more fully in the text. The instant case, of course, is one dealing with an attempt to acquire a benefit not yet enjoyed.

tract or as a result of local school custom, had no property interest in his job which would require that a "just cause" hearing be held prior to his dismissal.

Employing the *Roth* concept of Fourteenth Amendment rights, the Court has held that due process protections must accompany the deprivation of the following interests: property interest in continued public education, where the state had voluntarily established a free public school system which permitted suspension of pupils only for certain specified reasons, *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975); property interest in public employment as a college instructor, where custom at the institution had established a "de facto" tenure system wherein instructors could be dismissed only for just cause, *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); and liberty interest in prison good–time credits where applicable regulations indicated that such credits would be forfeited only for serious misconduct, *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). Conversely, the Court held that the following benefits did not rise to the level of protected interests and that, therefore, procedural due process was not a prerequisite to their deprivation: public employment, where neither custom nor contract conditioned discharge on the existence of good cause, *Roth, supra,* and *Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); continued incarceration in a particular prison, where applicable regulations contained no guarantee that an inmate would be transferred only under certain specified circumstances, *Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976).

In the case at bar, it is difficult precisely to delineate the nature and source of the property interest claimed by plaintiffs. Initially at least they appear to point to the CCO and the RFP as the sources of the interest. They rely specifically on the provisions therein which state that bids failing to comply with outstanding specifications or which fail to supply requested information would be rejected. Apparently, therefore, they are contending that their right to due process was denied when Warner was awarded the contract despite having failed to comply with those provisions. To the extent that this is indeed the plaintiffs' position, we must reject it. We cannot accept the proposition that either of the plaintiffs possessed a protected property interest in the adherence by council to the procedures outlined in the CCO and the RFP per se; i. e., that proof of a constitutional deprivation may be made by a showing, without more, of a breach of those provisions.

Recognition of the fact that the violation of a law is not, ipso facto, a deprivation of due process to all persons affected thereby is fundamental to an understanding of procedural due process. The due process clause is a narrow, personalized guarantee which only protects against the deprivation of one's own *liberty* and *property*; it is not a catch–all provision designed to promote the interest of society generally in the obedience of its laws. This principle is reflected in the oft–repeated precept that procedural due process issues require a two step analysis: the first to ascertain whether that of which the complainant was deprived constituted a personal liberty or property interest, and the second to determine the nature of the process to which the complainant was due as a legal prerequisite to any deprivation of the identified right. *Morrissey v. Brewer*, 408. U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972); *Wilkinson v. Abrams*, (3rd Cir. 1980) 627 F.2d 650, p. 664. Thus, in each due process case we have a separate benefit (the liberty or property interest) and a separate procedure (the delineated process due) involved. And to the extent that plaintiffs are pleading the deprivation of a protected interest as a result of council's failure to apply the provisions of the CCO and RFP to Warner, plaintiffs' protected *interest* and the *process due* obviously are one and the same, for the process they seek is, of course, adherence to the said provisions. In short, in our judgment there can be no property interest in a procedure

itself; [10] if there be a protected interest involved here, it is to be found in the *benefit* whose enjoyment is sought to be regulated by the procedure; namely, the award of the contract.

We believe that plaintiffs' constitutional claim reasonably may be interpreted as alleging such an interest in the contract.[11] We shall proceed on that basis to determine if, in fact, plaintiffs had a definable property interest in the contract.

That a true property interest existed in the award of the contract cannot, as defendants urge, be summarily rejected by noting that, unlike the usual due process case, plaintiffs' are not being deprived of some benefit which they presently enjoy, but rather one which they desire to acquire in the future. Both the Supreme Court and the Third Circuit have recognized that a due process interest in benefits sought to be obtained may arise out of the very provisions regulating their disbursement. *See Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979), and *Winsett v. McGinnes*, 617 F.2d 996 (3rd Cir. 1980).

In *Greenholtz*, the plaintiffs, who were Nebraska prison inmates, sought to establish a liberty interest in their future admission into Nebraska's discretionary parole program. Plaintiffs first argued that a protectable interest in parole release exists any time a state enacts a parole release provision, i. e., a due process interest in parole release can be drawn directly from the Constitution regardless of the language employed in the vehicle creating the parole program. The Court rejected that notion, reasoning that unlike the interest in parole *revocation* recognized in *Morrissey, supra*, as emanating directly from the Constitution, initial admission to parole involves a benefit not presently enjoyed, but one merely desired. Plaintiffs next argued that an interest arose from an independent source; namely, the particular language of the Nebraska statute, especially its provision that parole release "shall" be ordered unless one of four specified circumstances existed. Plaintiffs claimed that the structure of the provision and its use of the word "shall" mandated release of an inmate in the absence of a finding of one of the four enumerated exceptions and therefore that it created a legitimate expectation of admission to the program. The Court accepted that argument, holding that "the expectancy of release provided in [the] statute is entitled to some measure of constitutional protection." 442 U.S. at 12, 99 S.Ct. at 2106. While, unfortunately, the Court offered no rationale for its ruling, it is nevertheless clear that a Fourteenth Amendment liberty interest springing independently and directly from state law was recognized in a

10. *Service v. Dulles*, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957), cited by the plaintiffs, is not to the contrary. In *Service* the Court ruled that a governmental employee had been unlawfully discharged because his employer had violated its own agency regulations in making the dismissal. However, the claim stated there was strictly a statutory one based on the breach of federal regulations; there was no constitutionally-based claim nor ruling made involving the existence of a *property interest* in agency procedures.

*International Association of Firefighters v. Sylacauga*, 436 F.Supp. 482 (N.D.Ala.1977), also cited by plaintiffs, does deal with constitutional issues, but we do not find it persuasive here. In that case the court considered an alleged due process violation arising out of the failure of a city to follow its own stated procedures for the promotion of firemen. While there is language suggesting that the court found a property interest in the promotional rules as such, particularly the finding that "de-

fendant . . . deprived plaintiffs of their property interest in the promotional procedures described by state law . . .," at pp. 489–90, the constitutional discussion contained therein is too ambiguous for one to conclude that the case clearly stands for that proposition. It is quite possible that the court was really saying that the complainants had been denied their interest in the *job* by the city's violations of the promotion procedure. At any rate, for the reasons set forth in the text, we cannot accept *Sylacauga* to the extent that it holds that one may have a proper interest in a procedure.

11. We note, for example, plaintiffs' argument that "The establishment of these standards created an obligation of the municipal defendants as well as an expectation . . . that the cable communications system franchise would be awarded only to an applicant who satisfactorily complied with all those standards." Plaintiffs' brief p. 11.

benefit not presently enjoyed by those who sought to obtain it.

In *Winsett*, the Third Circuit faced an issue quite similar to *Greenholtz* when it dealt with a Delaware prison inmate's admission into that state's discretionary work release program. The plaintiff's liberty claim in *Winsett* was broadly similar to the property right plaintiffs assert here in that the state had established certain criteria for the granting of work release privileges to prison inmates, but certain officials had allegedly deviated from them in denying plaintiff's application. The defendants admitted that in denying the application they had considered criteria outside those specified in the work release provisions, but raised the threshold question of whether the program created a liberty interest under the Fourteenth Amendment. The Third Circuit, sitting en banc, held that as in *Greenholtz* no such interest emanated from the Constitution itself, but that one did arise as a result of the particular nomenclature of the Delaware program.

In reaching this result, the Circuit examined the various statutes and regulations pertinent to the work release program. One of the statutes, 11 Del.C. § 6533(a), provided that the Department of Corrections could adopt a work release program should it choose to do so. The Department thereafter adopted a program and promulgated regulations under which the principal criteria for admission were: "Demonstrated interest in personal improvement; progress toward increased maturity and self–understanding." In addition, admission into the program required approval at three distinct decision–making levels, the final one being the superintendent of the institution of incarceration, who, along with certain other specified officials, could make certain exceptions to the general procedures.

In analyzing these provisions, the circuit court rejected the trial court's conclusion that the program was essentially discretionary and that, therefore, it did not create a

protected interest. It was the Circuit's position that the officials' discretion, when viewed in the proper context, was not so limitless as to negate a legitimate claim of entitlement to the benefit sought. The court observed that in creating a tri–level process in which committees subordinate to the superintendent often made detailed evaluations of the applicants, the state could not have intended that these evaluations be arbitrarily vetoed by the superintendent. But primarily the court noted that 11 Del.C. § 6533(a) was subordinate to § 6531 which governed the establishment of a variety of programs in the state correctional system and which stated as general policy that:

"Persons committed to the institutional care of the Department shall be dealt with humanely, with effort directed to their rehabilitation, to effect their return to the community as safely and promptly as practicable. . . ."

That broad provision, said the court, also acted to limit the perimeters of the prison authorities' discretion by permitting them only to review applications in fulfillment of that policy, i. e., not arbitrarily, but humanely with a view to rehabilitation and the return to the community as safely and promptly as practicable.

It is apparent from *Greenholtz* and *Winsett* that in order to assess plaintiffs' claim of a property interest in the award of the cable television contract we must examine the state and local laws regulating its award, some of which have been mentioned previously.[12] Initially, we note that under Art. VII § 161.02(b) of the City Code and § 425.26(d) of the CCO the city retained the right to reject *all* bids for the cable television contract. Also, both § 511 of the City's Home Rule Charter and Article VII § 161.-02 of the City Code state that, except for certain types of projects not here involved, contracts are to be awarded to the "lowest responsible bidder." Thus, while the city was under no obligation to award a cable

**12.** Unlike *Greenholtz* no claim is made here by plaintiffs that their due process right emanates directly from the Constitution.

television contract, if it chose to let the contract, it was required by law to award it to the lowest responsible bidder. In that regard, the Pennsylvania courts hold that in determining who, in fact, is the lowest responsible bidder the awarding party must exercise its discretion in a non–arbitrary fashion. *Lutz Appellate Printers, Inc. v. Commonwealth of Pennsylvania*, 485 Pa. 559, 403 A.2d 530 (1979); *Zurenda v. Commonwealth of Pennsylvania*, 46 Pa.Cmwlth. 67, 405 A.2d 1124 (1979).

With regard to compliance with bid specifications, it appears that: 1) Art. VII § 161.05 of the City Code requires bids for any city contract to comply with the relevant specifications; 2) the preface to the RFP required all bids to comply with the CCO; 3) both § 425.15(b) of the CCO and the preface to the RFP provided that bids which did not supply all information requested would be given no consideration; and 4) in meetings with the prospective bidders, employees of the city allegedly stated that bids must comply with the specifications in all details and that no opportunity for amendment would be provided.

The above laws and regulations constitute the "existing rules or understandings" from which the property interest, if present, is created and its dimensions defined. *Roth, supra*, 408 U.S. at 577, 92 S.Ct. at 2709. Our analysis of those provisions in light of *Greenholtz* and *Winsett* leads us to conclude that in the circumstances of this case a property interest of relatively narrow dimension exists. Simply stated, that interest was the right of the lowest responsible bidder in full compliance with the specifications to be awarded the contract once the city in fact decided to make an award. The due process to which one possessing the protected interest was entitled was the non–arbitrary exercise by the city of its discretion in making the award. And it follows that a deprivation of the substantive benefit (the protected property interest) without the process due is an actionable wrong.

The conclusion that there exists a property interest here is based largely on our conviction that there is no material distinction between this case and *Winsett*. Both deal with one's attempt to acquire a future benefit by satisfying certain statutorily–stated criteria, albeit a liberty interest in *Winsett* and a property interest here. The determinative factor in *Winsett* was that the scope of discretion to be employed in assessing an applicant was not absolute, but under state law had to be exercised in a reasonable manner. The same is true in the case at bar; *Lutz* and *Zurenda* make it clear that the city was required to act non–arbitrarily in assessing the various bids. The distinction that in our case the city retained the right to reject all bids and that, unlike the *Winsett* authorities, it arguably had total discretion at that initial point, is illusory because the city *did* in fact decide to make the award. At that time their initially unfettered discretion became circumscribed.[13] Thus, we believe that under the peculiar facts of this case *Winsett* is indistinguishable. As it concluded that a prisoner seeking work release possessed a liberty interest,[14] so we hold that a property

---

**13.** It seems to us that the only significance in the right of city to reject all bids is in the fact that if it chose to award no contract, no due process claim would arise, even if Three Rivers could establish that among those competing it was the lowest responsible bidder.

**14.** We note that the specific holding in *Winsett* was that "... a state–created liberty interest in work release arises when a prisoner meets all eligibility requirements under the state regulations and the exercise of the prison authorities' discretion is consistent with work release policy." 617 F.2d at 1007. We have considered the possibility that a literal reading of that language might lead one to conclude that a

Fourteenth Amendment interest in a future benefit, such as work release in *Winsett* or the award of the cable television contract in the case at bar, does not arise until the party asserting that interest establishes the merits of his claim to the ultimate benefit, i. e., proves that but for the denial of the process due he would have obtained the benefit.

If a literal application be given to the *Winsett* holding, only one of all the bidders for the instant contract would be entitled to due process (a non–arbitrary evaluation of its bid), since obviously there can only be one lowest responsible bidder. However, when *Winsett* is read in the light of its underlying rationale as set forth

interest in the award of the cable television contract was possessed by Three Rivers as a bidder for that contract.[15]

 In addition to their claim that plaintiffs' interest in the contract was simply too speculative to invoke due process, defendants contend that plaintiffs lack standing to assert a Fourteenth Amendment deprivation. In support of this position they cite both federal and Pennsylvania case law which limit somewhat the standing of disgruntled bidders to challenge governmental contract awards. See *Perkins v. Lukens Steel Co.*, 310 U.S. 113, 60 S.Ct. 869, 84 L.Ed. 1108 (1940) and *American Totalisator Co. v. Seligman*, 27 Pa.Cmwlth. 639, 367 A.2d 756 (1976). However, those cases are clearly inapposite, because there the plaintiffs' claims are based on state or federal procurement statutes, rather than, as here, on constitutional grounds. It may be that those plaintiffs lacked standing to raise statutory claims, but the existence of standing cannot be questioned seriously with regard to the constitutional claim raised here. When a plaintiff alleges that he has been deprived of *his* liberty or property, it seems rather vain to argue that he does not satis-

fy the injury–in fact, zone–of–interest, requirements for standing. In a sense, much contained in the notion of standing is subsumed within the question of whether or not plaintiff's interest in a particular benefit is sufficient to create a liberty or property right initially, a dispute which we have resolved previously in this case.[16] In sum, the standing cases cited by defendants would only be relevant if plaintiffs' claim was statutory rather than constitutional.[17]

Finally, while for convenience we have to this point made no distinction between the two plaintiffs in our discussion of this constitutional claim, it is nevertheless evident from the foregoing that any property interest which exists in this case is possessed solely by Three Rivers, since it is the only party–plaintiff which bid on the contract. Plaintiffs have cited no authority, and we have found none, for the proposition that Matthew Moore's status as a taxpayer or prospective shareholder of Three Rivers is sufficient to vest in him any constitutionally protected property interest under the due process clause or even to confer on him the right derivatively to raise any denial–of–equal–protection claim which Three Rivers may have. Therefore, all claims under

in the text, as well as its reliance on *Greenholtz*, which is plainly not so restrictive, it is clear that the Circuit did not intend that *Winsett* be applied in such an anomalous way. Thus, in this case Three Rivers need only establish *its status as a bidder on the contract for its* property interest therein to arise, i. e., to invoke the procedural protections of the due process clause applicable to the bid process.

15. *Estey Corporation v. Matzke*, 431 F.Supp. 468 (N.D.Ill.1976), cited by defendants, does not persuade us to a contrary holding. In that case the court concluded that a losing bidder on a state contract had no property interest in the award thereof. To the extent that *Estey* offers that conclusion as a proposition of general applicability, we have no choice but to disagree with the district court in light of our interpretation of the Third Circuit's pronouncement in *Winsett*.

16. A detailed discussion of the evolution of standing concepts, particularly as they relate to the assertion of constitutional claims, is found in *Americans United, Etc. v. H.E.W.*, 619 F.2d 252 (3rd Cir. 1980), most recently applied in *United States v. Westinghouse*, 638 F.2d 570 (3rd Cir. 1980).

17. Even if the claim here was statutorily-based, it is still likely that standing to bring this suit would exist. The federal case holding that a mere disgruntled bidder lacked standing, *Perkins v. Lukens Steel Co., supra*, is now understood by the Third Circuit and other circuits as tacitly having been rejected by subsequent Supreme Court cases. *See Merriam v. Kunzig*, 476 F.2d 1233 (3rd Cir. 1973) and cases cited therein. *Merriam* indicates that disgruntled bidders, such as Three Rivers, probably would have standing if this suit were brought on federal statutory grounds.

The Pennsylvania position on standing is that a losing bidder has standing to challenge an award in its status as a state taxpayer and not otherwise. *Heilig Bros. v. Kohler*, 366 Pa. 72, 76 A.2d 613 (1950); *American Totalisator Co. v. Seligman*, 27 Pa.Cmwlth. 639, 367 A.2d 756 (1976); *Price v. Philadelphia Parking Authority*, 422 Pa. 317, 221 A.2d 138 (1966). Here the plaintiffs apparently qualify, since the complaint alleges that Three Rivers is incorporated under the laws of Pennsylvania and that Matthew Moore is a taxpaying resident thereof.

count I will be dismissed insofar as they are asserted by plaintiff Moore.

## B. The Statement Of An Equal Protection Claim Under § 1983

■ Paragraph 10 of the complaint alleges that the award of the contract to Warner was the product of "a predetermined and unlawful preference in favor of Warner and against Three Rivers . . . ." More specifically, Three Rivers alleges that in evaluating the various proposals the municipal defendants accorded Warner's bid preferential treatment and that Warner alone was permitted to amend its bid on two occasions.

Those allegations of unequal application of the otherwise facially neutral bidding provisions clearly state a § 1983 claim for denial of equal protection. The Supreme Court long ago held that:

> Though [a] law itself be fair on its face and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the Constitution. *Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886).

■ The defendants suggested at oral argument that no equal protection claim was, or could be, stated here because plaintiff was not a member of a suspect class, nor was it being deprived of any fundamental or property right independently cognizable under the Fourteenth Amendment. This position is not well taken. While we have found the existence of an independent property right in our assessment of the due process claim of Three Rivers, the finding of such a right is not a prerequisite to an equal protection claim. From the language of the Fourteenth Amendment, ". . . nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws," it is clear that the due–process and the equal–protection guarantees are in separate clauses and that property and liberty interests pertain only to the former. Second, it is well established that the existence of a suspect class or fundamental right merely affects the level of scrutiny to which an apparently unequal application of the law will be subjected; it is in no way relevant to one's initial right to claim the protection. *See generally,* Nowak, "Constitutional Law," (1978), Ch. 16, § C. Thus, equal protection claims have been recognized in the commercial setting where plaintiffs of nonsuspect classes have complained of the unequal application of an otherwise neutral provision. *See, Cook v. City of Price,* 566 F.2d 699 (10th Cir. 1977) (selective enforcement of zoning ordinance re "home businesses" to deny plaintiff operation of her boutique); *Burt v. New York,* 156 F.2d 791 (2nd Cir. 1956) (discriminatory denial of building permits to plaintiff architect); *Milnot Company v. Arkansas State Board of Health,* 388 F.Supp. 901 (E.D.Ark. 1975) (selective enforcement of local "filled milk" statute against plaintiff milk producer but not against others selling essentially the same product).

## C. The Statement of a § 1985 Claim

■ While we conclude that plaintiff Three Rivers does state a § 1983 claim for denial of equal protection, the question remains whether it also states a claim under § 1985(3) for conspiratorial denial of equal protection. We believe that it does not. While it may be argued that the Supreme Court's principal decision in the § 1985 area, *Griffin v. Breckenridge,* 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971), left the issue unresolved, the Third Circuit has recently held that a § 1985(3) claim (as distinguished from a § 1983 claim) must allege *class–based* discrimination grounded on some immutable characteristic such as race or sex. *Carchman v. Korman Corporation,* 594 F.2d 354 (3rd Cir. 1979) (tenants' association for an apartment building does not constitute a class based on immutable characteristic).

In the instant case, Three Rivers has alleged that a competing cable firm, Warner,

was accorded preferential treatment, but there is no allegation in the complaint that this discrimination was based on some immutable characteristic possessed by one and not the other. And it is not sufficient for plaintiff merely to allege, as it does, that the municipal defendants favored Warner's minority participation program over that of Three Rivers, for this is not an allegation of discrimination based on race. Obviously, the choice of one minority group over another minority group possessing the same immutable characteristic can hardly amount to race–based discrimination. In short, it is not enough that some members of a particular minority group were discriminated against while other members of the same minority group were favored by the complained–of act; it must be alleged that their minority status was the *reason* for the discrimination, and this logically cannot be if they are all of the same minority group. Accordingly, plaintiff's § 1985 claim will be dismissed.

### D. The Statement of Fifth And Fourteenth Amendment Claims

■ In addition to asserting its due process and equal protection claims under § 1983, Three Rivers seeks to raise them directly under the Fifth and Fourteenth Amendments. Neither the Supreme Court nor the Third Circuit has resolved the question of whether the Fourteenth Amendment provides a direct remedy for deprivations of this sort. *See Mt. Healthy City Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Rogin v. Bensalem Township,* 616 F.2d 680 (3rd Cir. 1980). However, *Rogin* suggests that there is no need to imply such a remedy where all of the relief to which plaintiff would otherwise be entitled is available under § 1983. That is the case here, and plaintiff's Fourteenth Amendment cause of action will be dismissed.

■ As for an asserted Fifth Amendment cause of action, the due process guarantee contained therein is, of course, addressed to activity of the federal government, and since there is no suggestion that any of the defendants has any association with the federal government, that claim also will be dismissed.

### E. The Presence Of "Official Policy" and State Action

■ The defendants move to dismiss all of the constitutional claims of the complaint for its failure to allege that the claimed deprivations were, in the municipal defendants' case, the product of some "official policy" as is required under *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), and, in Warner's case, done "under color of state law" as is required under § 1983. As to the municipal defendants' claim, we note that in *Monell* the Supreme Court ruled that local government entities may be held liable in money damages for constitutional violations committed by their employees only if those actions implement "official policy," i. e., *respondeat superior* is not a basis for recovery from local government bodies. The municipal defendants claim that plaintiffs' complaint fails to allege that the challenged action here was done in furtherance of some official policy.[18]

In *Monell* the Court had no need to consider exactly what constitutes "official policy," since its existence was not denied. *Monell, supra,* at n. 2. However, it did note that official policy included a "policy statement, ordinance, regulation, or decision officially adopted and promulgated by [a] body's officers ...," as well as "deprivations visited pursuant to government 'custom' even though such custom had not received formal approval through the body's

---

**18.** The immunity *Monell* thus provides to municipalities also extends to the individual defendants sued in their official capacity, since official capacity suits are tantamount to suits against the public body itself. *Monell, supra,* at n. 55. In the instant case, the defendant council members have been sued only in their

official capacity. Not only is this apparent from the caption of the complaint, but in addition at oral argument counsel for plaintiffs stated that plaintiffs seek no recovery out of the personal assets of said individuals. Transcript, May 21, 1980, Argument, p. 80.

official decision making channels." *Monell, supra,* at 690–1, 98 S.Ct. at 2036. The Court also observed that in addition to its lawmakers, a governmental body's "policy" may be made by "those whose edicts or acts may fairly be said to represent official policy ...." *Monell, supra,* at 694, 98 S.Ct. at 2038.

In the instant case, the municipal defendants ingeniously argue that plaintiff actually charges them with *violating* official policy rather than implementing it. They syllogize as follows: The official policy of the city as expressed in state law and in its own Home Rule Charter is to award contracts to the lowest responsible bidder; the gravamen of plaintiffs' charge is that the municipal defendants failed to award the contract to the lowest responsible bidder; therefore, they are being charged with violating, rather than implementing, city policy.

The fallacy in defendants' reasoning is readily apparent. State law and the Home Rule Charter obviously are not the sole repository of the city's official policy. It is clear from *Monell* that policy is whatever those authorized to speak for the governmental body formally say it is, regardless of whether any such statement conflicts with some earlier expressed ideal. And one would be hard pressed to imagine an act that more readily could be characterized as "official policy" than that which is the basis of plaintiff's claim; namely, a resolution (awarding the cable television contract to the defendant Warner) passed by city council in regular session pursuant to specifically granted powers. Were we to accept defendants' position, municipalities would be insulated from § 1983 liability by the very oaths which many, if not all, governmental bodies require their officials to take requiring adherence to the Constitution and laws of the United States, because any subsequent act contrary to the Constitution, ipso facto, could not be "official policy." Thus, even though deprived of an otherwise constitutionally protected right, an injured party would have no cause of action against perhaps the only entity which could respond in damages. The anomaly is obviously unacceptable, and we therefore reject this argument.

■ As to Warner's claim that there is no allegation that it acted under color of state law, it is true that a private entity's individual action normally would not constitute state action so as to subject it to suit under § 1983. However, it is well settled that where a private entity acts in concert with a state actor, the former is also subject to liability under § 1983. *Adickes v. Kress & Co.,* 398 U.S. 144, 152, 90 S.Ct. 1598, 1605–1606, 26 L.Ed.2d 142 (1970); *Jennings v. Shuman,* 567 F.2d 1213 (3rd Cir. 1977). Three Rivers has alleged that Warner acted in concert with employees of the Department of Public Works who gave Warner an opportunity to amend its bid (Complaint ¶ 58). Thus, insofar as that or other similar concerted activity forms the basis of a claim for relief, Warner's motion to dismiss for plaintiff's failure to allege that Warner acted under color of state law will be denied.

### F. *Legislative Immunity*

■ The municipal defendants next assert absolute legislative immunity. Specifically, they argue that the act of which plaintiff complains--council's authorization of the contract award to Warner--was legislative in nature and, therefore, under *Tenney v. Brandhove,* 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951), and its progeny they are absolutely immune from liability. Plaintiffs respond first that the award was executive or administrative in character and, second, that even assuming that it was legislative, immunity of the type claimed by defendants does not extend to a municipality or its employees sued in their representative capacity, but only to municipal employees sued in their individual capacity.

In order for defendants to prevail, it must appear from the complaint that the critical act is legislative in character. *Gorman Towers, Inc. v. Bogoslavsky,* 626 F.2d 607 (1980, 8th Cir.). The relevant act cited in count I is the adoption by council of the resolution authorizing the award of the contract to Warner. We must therefore determine if on its face the act was legislative, in

which event there may be immunity, or whether it was executive or administrative, in which event there would be no legislative immunity even though it was done by a body essentially legislative in character.

Legislative acts are said to be broad, general policy statements establishing guidelines by which the future conduct of an entire group of persons falling within a particular classification will be judged. See *Rogin, supra,* at 693. By contrast, executive or administrative acts in this context generally consist of the application of legislation to specific situations. See *Rogin, supra,* at n. 60. Thus, *Rogin* held that while an amendment of a local zoning provision having application to all property within a certain district was a legislative act, the denial of a variance under that legislation to a particular individual was an administrative act. Likewise, the Supreme Court recently held that the promulgation of ethical rules by a state supreme court was a legislative act, whereas the enforcement of those rules by that court was not legislative and thus could not be defended on the basis of immunity. *Supreme Court of Virginia v. Consumers Union,* 446 U.S. 719, 100 S.Ct. 1967, 64 L.Ed.2d 641 (1980).

While the distinction between legislative and administrative acts is sometimes unclear, that is not true in the case at bar. The only relevant legislative act we can discern from the facts of this case was the passage of the CCO, which set forth the specifications and requirements to be met by all bidders. The subsequent adoption of the resolution awarding the contract to Warner, on the other hand, was clearly an administrative act, since it was the culmination of a process whereby the broad policy enunciated in the CCO and implemented by the RFP was being applied in a specific instance to determine to what bidder the contract should be awarded. The fact that the decision was made via a resolution is immaterial, since it is clear from *Rogin* and *Consumers Union, supra,* that the test is the nature of the act and not how it is accomplished. Indeed, long ago the Pennsylvania courts explicitly ruled that the award of a governmental contract pursuant to previously granted authority so to do was an administrative rather than a legislative act. *Jones v. Schuylkill,* 202 Pa. 164, 51 A. 762 (1902); *Seitzinger v. Tamaqua Borough,* 187 Pa. 539, 41 A. 454 (1898); *Cf. Wilkes–Barre Connecting R.R. Co. v. Kingston Borough,* 319 Pa. 471, 181 A. 564 (1935). Since we find that the questioned act was administrative and not legislative,[19] we need not address plaintiff's secondary argument, to–wit, that even if this was a legislative act, *Tenney*–type immunity would not extend to the municipal defendants sued in their official capacity.[20]

G. *Specificity Of The Complaint*

Defendant Warner alleges that plaintiff's pleading is too vague and conclusory to satisfy the well established requirement that civil rights complaints must be pleaded with specificity. *Esser v. Weller,*

---

**19.** In a recently filed supplemental brief, defendant Warner seeks to support its argument for legislative immunity by citing three newly decided cases in the Third, Fourth, and Eighth Circuits respectively. *Rogin v. Bensalem Township,* 616 F.2d 680 (3rd Cir. 1980); *Bruce v. Riddle,* 631 F.2d 272 (4th Cir. 1980); *Gorman Towers, Inc. v. Bogoslavsky,* 626 F.2d 607 (1980, 8th Cir.). Those cases hold that no denial of due process or equal protection occurs where a local government body acts arbitrarily in enacting new zoning laws and that any members of the public who privately lobbied for such laws were privileged so to do by the First Amendment. However, those cases beg the question, since there was no real dispute that they involved legislative acts, whereas that is the very issue before us in this case.

**20.** Of course even administrative acts may be clothed with a limited good–faith immunity in certain circumstances, *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). However, good–faith immunity is an affirmative defense, *Gomez v. Toledo,* 446 U.S. 635, 100 S.Ct. 1920, 64 L.Ed. 572 (1980). Since we are still in the motion stage of the proceedings and none of the defendants has filed an answer, the viability of that defense and the related question suggested by plaintiff that under *Owen v. City of Independence,* 445 U.S. 622, 634, 100 S.Ct. 1398, 1407, 63 L.Ed.2d 673 (1980) even this limited immunity is unavailable to government officials sued in their official capacity, are not now before the court.

467 F.2d 949 (3rd Cir. 1972). We disagree. As to both the due process and equal protection claims, the plaintiffs have stated in specific terms how they were denied due process (by council refusing to disqualify Warner's bid and to award the contract to the lowest responsible bidder); how they were denied equal protection (by certain defendants permitting Warner's bid to be amended and evaluated according to a more favorable standard); when those violations occurred (in November of 1979 meetings with employees of the Department of Public Works and at the public hearing wherein the award was made); and who committed the violations (council members, and certain city employees of the Department of Public Works acting in concert with Warner). We believe that plaintiffs have been sufficiently specific.

## H. *Failure To Join Indispensable Parties*

■ The municipal defendants moved to dismiss the complaint under Rules 12(b)(7) and 19, Fed.R.Civ.P., on the ground that the plaintiff had failed to join the remaining two bidding companies, Allegheny Cablevision, Inc., and Community Cablevision, who defendants contend are indispensable parties to this action. Movants misconceive the function and purpose of Rule 19, which requires dismissal of an action only after the court determines that a person described under subdivision (a) thereof should be joined but cannot be. *See* discussion in *Wright & Miller*: Civil § 1602.

The rule imposes no burden on the plaintiff in the first instance to take the initiative to join such a party, in fact it provides that the court shall order the joinder when it determines that this is indicated under the rule. And dismissal is, in effect, a last resort measure to be taken only when for reasons of jurisdiction or venue such a person cannot be brought into the action. *Heath v. Aspen Skiing Corp.*, 325 F.Supp. 223, 229 (D.C.Colo.1971).

There is nothing in the record before the court from which it could conclude that there are entities who should be made parties under Rule 19(a) but who cannot be joined without depriving the court of jurisdiction or venue. The *Zurenda* case, *supra*, cited by the movants for the proposition that "... under Pennsylvania law *all* disappointed bidders must be joined in any action to void a government ..." contract award (City brief p. 51) (emphasis added) holds only that the *successful* bidder (here, Warner) need be joined.

The Court in *In Re Caesars Palace Securities Litigation*, 360 F.Supp. 366 (S.D.N.Y. 1973) at p. 395 pointed to the numerous factors which must be considered in disposing of this type of motion and concluded that none of them possibly could be considered on the bare record then before it. The same applies in our case, and the defendants' Rule 12(b)(7) motion will be denied.

## IV. COUNT II: THE VAGUENESS CLAIM

■ In count II Three Rivers seeks relief under the Fourteenth Amendment because of the adoption by the city of certain allegedly vague and conflicting bid specifications. More particularly, plaintiff charges that language in the CCO and RFP regarding minority inclusion in the corporate structure of bidding companies was so ambiguous and contradictory as to deny plaintiff its rights under the due process and equal protection clauses. Defendants have moved to dismiss this count for failure to state a claim, arguing that it is clear from the face of the specifications that they are neither vague nor contradictory. In view of the fact that Three Rivers has tendered to the court matters outside the pleadings, specifically the RFP, and that the RFP and the CCO appear to contain all the matter relevant to this claim, we shall treat the defendants' motion as having been converted under Rule 12(b)(6) to a Rule 56 motion for partial summary judgment, and that motion will be granted.

The matter of female and minority involvement is covered entirely in the CCO and the RFP. Section 425.17(f) of the CCO states:

(f) Any person submitting a proposal to enter into an agreement for the award of a franchise in accordance herewith may offer consideration in addition to that listed in subsections (a), (b), (c), (d), (e), hereof, including, but not limited to, additional services and/or facilities and minority or female ownership. For purposes of this section a "minority" means a citizen of the United States who is not a member of the Caucasian race and is of Oriental, Asian, African, American Indian, Eskimo, Aleut, Puerto–Rican or Mexican American Ancestry. Nothing in this chapter shall be construed by inference or definition to indicate that female and minority are synonymous or should be considered as same [21]

The following passages appear in the RFP's preface and §§ 6.8 and 6.9 respectively:

Proposals should address in a positive and meaningful way, full–scale minority participation in the proposed cable communications system (see Section 425.17 of the Code).

6.8 Describe in detail the nature and extent or current ownership in applicant by minority and female individuals or enterprises, including the extent to which such ownership is by persons or enterprises located within the standard metropolitan area around the City of Pittsburgh and when such ownership was acquired.

6.9 Detail provisions, if any, for including minorities and women in ownership for each year of the term of the Agreement awarding a franchise.

Plaintiff contends that those specifications are both vague and conflicting in that: 1) they fail to define adequately the phrases "minority or female ownership" and "full scale minority participation," thereby creating ambiguity and apparent contradiction; and 2) assuming that those phrases are con-

tradictory, they fail to state specifically which requirement takes precedence over the other.

As the Supreme Court has noted, the standard to be applied in resolving this type of claim is whether the challenged language is so lacking in certainty and definiteness that persons of ordinary intelligence must necessarily guess at its meaning. *Hynes v. Mayor of Oradell*, 425 U.S. 610, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976). This standard, the Court indicates, applies with "particular force" when the questioned statute is either penal or implicates First Amendment rights, *Hynes, supra*, at 620, 96 S.Ct. at 1760. Of course, the questioned provisions in this instance are neither.

Applying the ordinary intelligence standard, we find no undue ambiguity in the minority involvement specifications. In our judgment, the meaning of the terms "full–scale," "ownership," and "participation" are sufficiently definite. The meaning of "ownership" is self–evident. The term "full–scale" is commonly understood as suggesting an act or thing which is substantial, something significant and meaningful, as contrasted with minor or half–hearted. "Participation" means to share or to have a share in common with others, and in this case it is clearly consistent, not only intrinsically but contextually as well, with "ownership" since the preface to the RFP in which it appears makes a direct reference to § 425.17 of the CCO where the term "ownership" is used. Furthermore, aside from the generally understood meaning of the individual words, the phrases "minority or female ownership" and "full scale minority participation," when read in context are sufficiently clear and definite that persons of ordinary intelligence need not guess at their meaning.

And, while it may not be germane at this point, we note from both the complaint and the "Evaluation of Proposals" prepared by the Bureau of Cable Communications and

---

21. Sub-sections (a), (b), (c), (d), and (e) relate to mandatory forms of consideration such as payment of a certain percentage of the franchisee's annual gross revenues to the city; granting the city an option to purchase the system; installation of a television studio in the City County Building; free service to any building designated by the city which is used for a public purpose; and free service as well to all schools and colleges within the city.

filed of record, that in terms of the amount and type of participation offered minorities, the Three Rivers and Warner bids were quite similar to one another.[22] This suggests to us that in fact Three Rivers neither was confused nor uncertain as to what the city wanted in the way of a minority involvement program.

There remains the question of whether or not, as plaintiff contends, the two phrases are somehow contradictory. Unfortunately plaintiff offers scant clue to its reasoning on this point, being content merely to assert that a contradiction exists without in any way indicating a basis for the assertion.

In any event, as we view the language itself, we note that one phrase speaks of *"minority or female ownership"*, while the other refers to *"full–scale minority participation."* The addition of the term "full–scale" in the latter phrase appears to be insignificant. The difference between "minority" and "minority or female" and between "ownership" and "participation" are only slightly more material. But even those differences, when considered in context, do not render the specifications constitutionally infirm. The phrase "full–scale minority participation" appears in the preface to the Introduction section of the RFP. The Introduction addresses in general terms a wide variety of subjects including, inter alia, directions for completing the various sections of the RFP, where and how to file bid proposals, the cost of filing said proposals, and so forth.

The preface is even more general in tone, referring, inter alia, to the purpose of the RFP, the desire of the city to obtain the optimum system, and the character of the bids as irrevocable offers. Thus, a fair reading of the preface to the RFP in context should have placed one on notice that matters regarding bid specifications contained in that portion of the RFP were somewhat less than definitive. This is con-

firmed when one notes that the phrase relating to minority participation appearing in the preface is preceded and followed by more particular and formal provisions dealing with minority involvement, which are entirely consistent with one another. Specifically, § 425.17(f) of the CCO, which was enacted prior to the publication of the RFP, and §§ 6.8 and 6.9 of the RFP itself, which follow the preface in the designated section dealing particularly with minority involvement, refer only to *ownership* by minorities *and females*; there is no use of the words "full–scale" or "participation," or of minorities but not of females. If this fact alone, that the substantive provisions dealing with minority involvement are entirely consistent, was not sufficient to advise a bidder as to what was expected of it, then any remaining doubt should have been eliminated by the fact that the "ambiguous" or "contradictory" phrase in the preface was followed immediately in parentheses by a citation to § 425.17 of the CCO. With all of that, it is difficult to understand how even the most imperceptive bidder would not have been advised as to what the controlling provisions on minority involvement were.

Accordingly, with regard to count II, the Fourteenth Amendment claim based on the allegedly ambiguous and contradictory language of the minority involvement specifications, there being no genuine issue as to any of the foregoing material facts relating to the existence or textual content of the CCO and RFP, and for the foregoing reasons the court having found that as a matter of law the bid specifications were not so vague and conflicting as to have violated plaintiff's constitutional rights to due process and equal protection of the laws, partial summary judgment will be entered in favor of the defendants and against the plaintiff Three Rivers.

**22.** Three Rivers' proposal provided for 15% of its system to be purchased by minorities, each of whom would vote his or her own stock. Warner's program offered to grant a 20% ownership in 17 minority organizations for no or nominal consideration, but the voting right of

said stock was to be held by a voting trust composed of three individual minority persons. Both companies proposed to fill one–third of their board of director positions with minority persons.