**560**

CINEVISION CORPORATION, a
corporation, Plaintiff,

Wolf and Rissmiller Concerts, a
corporation, Plaintiff-Appellant,

v.

CITY OF BURBANK, a Municipal Corpo-
ration of the State of California, and
Jim Richman, Defendants-Appellees.

CINEVISION CORPORATION, a corpo-
ration, and Wolf and Rissmiller Con-
certs, a corporation, Plaintiffs-Appel-
lees,

v.

CITY OF BURBANK, a Municipal Corpo-
ration of the State of California and
Jim Richman, Defendants-Appellants.

CINEVISION CORPORATION, a corpo-
ration, and Wolf and Rissmiller Con-
certs, a corporation, Plaintiffs-Appel-
lees,

v.

CITY OF BURBANK, a Municipal Corpo-
ration of the State of California and
Jim Richman, Defendants-Appellants.

CINEVISION CORPORATION, a
corporation, Plaintiff,

Wolf and Rissmiller Concerts, a
corporation, Plaintiff-Appellant,

v.

CITY OF BURBANK, a Municipal Corpo-
ration of the State of California, and
Jim Richman, Defendants-Appellees.

Nos. 83–5606, 83–5730, 83–5949
and 83–6154.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 5, 1984.

Decided Oct. 18, 1984.

Bert Deixler, John W. Cochrane, Manatt, Phelps, Rothenberg & Tunney, Los Angeles, Cal., for plaintiffs-appellees.

William B. Rudell, City Atty., Douglas Holland, Asst. City Atty., City of Burbank, Anthony Liebig, Timm A. Miller, Lillick McHose & Charles, Los Angeles, Cal., for defendants-appellants.

Before SNEED and REINHARDT, Circuit Judges, and EAST,* District Judge.

REINHARDT, Circuit Judge:

Cinevision Corporation entered into a contract with the City of Burbank to promote concerts in a municipally-owned amphitheater. Ostensibly acting pursuant to the terms of the contract, the Burbank City Council rejected six of Cinevision's proposed concerts. Cinevision filed an action under 42 U.S.C. § 1983 (1982) against the City and a member of the City Council alleging that the entertainers were denied access to a public forum in violation of the first amendment on the basis of the content of their expression and other arbitrary factors. A jury concluded that the City and the councilman had violated Cinevision's first amendment rights and awarded compensatory damages. In addition, the jury determined that the councilman had acted in bad faith and therefore was liable for damages. The district court awarded Cinevision attorney's fees. We affirm.

## FACTS

In 1975, the City of Burbank entered into an agreement with Cinevision Corporation that gave Cinevision the right to promote live entertainment in the Starlight Bowl, a municipally-owned amphitheater, for the summers of 1975 through 1979. The contract provided, in relevant part, that,

> Cinevision will provide the City with a schedule of shows and performances which it proposes to present in the Starlight Bowl during that year's period, including a description of the *nature and content* of each show or performance and the names of the participants. *The City shall have the right to disapprove and cancel any show or performance which has the potential of creating a public nuisance or which would violate any State law or City ordinance.* Cinevision shall have the right to meet and confer with the City Council regarding the disapproval and cancellation of any of its scheduled shows and performances, but the decision of the City Council shall be final and conclusive. (emphasis added).

With the City Council's approval, Cinevision presented a number of concerts in the Starlight Bowl during the summers of 1975 and 1976. As an outspoken opponent of the concerts in the Bowl, James Richman was elected to the Council in 1977. Councilman Richman opposed all of Cinevision's proposed concerts in 1977 and 1978. Despite that opposition, Cinevision still was able to gain the Council's approval for some concerts for the 1977 and 1978 seasons.

---

* Hon. William G. East, Senior United States District Judge for the District of Oregon, sitting by designation.

Cinevision proposed concerts by eight artists for the summer of 1979. Several council members, including Richman, objected to the proposals. The most frequently voiced objections were that the artists played "hard rock" music and would attract narcotics users to the community. As he did in 1977 and 1978, Councilman Richman argued strongly against approving any of the proposed concerts. After much debate, the City Council rejected all but two of the concerts.[1]

Cinevision filed an action under 42 U.S.C. § 1983 claiming that the City's and Councilman Richman's actions violated its first amendment rights.[2] The jury, instructed that the first amendment protected Cinevision against arbitrary, content-based rejection of the entertainers, returned a verdict in favor of Cinevision. The jury found that: (1) the City and Richman had violated Cinevision's first amendment rights and were jointly and severally liable to Cinevision for $20,000 in compensatory damages; and (2) because "[t]he deprivation of the freedom of expression of Cinevision Corporation by James Richman was the result of willful, wanton, malicious or oppressive conduct by James Richman," he was liable for $5,000 in punitive damages. In addition, as authorized by 42 U.S.C. § 1988 (1982), the district court ordered the defendants to pay Cinevision $119,288 in attorney's fees.

The district court exercised jurisdiction under 28 U.S.C. § 1331 (1982), because plaintiff's claims raise federal questions, and under 28 U.S.C. § 1343(a)(3) (1982), be-

cause plaintiff alleges civil rights violations under 42 U.S.C. § 1983 (1982). We exercise jurisdiction over the district court's final decision under 28 U.S.C. § 1291 (1982).

## I. THE INFRINGEMENT OF CINEVISION'S FIRST AMENDMENT RIGHTS

The City of Burbank challenges the finding that it violated Cinevision's first amendment rights, on several grounds. First, the City contends that Cinevision does not have a protected first amendment right to promote concerts. Second, the City claims that the Starlight Bowl is not a public forum and therefore it is not limited by the first amendment in regulating access to the Bowl.[3] Finally, the City argues that its actions in disapproving proposed concerts were in any event consistent with the Constitution. In resolving these complex issues, we recognize that "[t]he First Amendment, as with other parts of the Constitution, must deal with new problems in a changing world." *Board of Education, (Island Trees) v. Pico*, 457 U.S. 853, 885, 102 S.Ct. 2799, 2817, 73 L.Ed.2d 435 (1982) (Burger, C.J., dissenting).

### A. *First Amendment Rights of Concert Promoters*

The City alleges that Cinevision did not have any first amendment rights that were implicated here. On this basis, the City argues that the district court's instructions to the jury created a "brand new" first

---

**1.** The City Council refused to approve proposed concerts by Blue Oyster Cult, Jackson Browne, Roxy Music, Todd Rundgren, Patti Smith, and Al Stewart. The City Council approved proposed concerts by Robert Palmer and Poco.

**2.** Wolf & Rissmiller Concerts was also a plaintiff in the original action. Prior to the time the litigation was instituted, Cinevision assigned the rights under its agreement with the City of Burbank to Wolf & Rissmiller. The district court granted a motion for a directed verdict against Wolf & Rissmiller because it was not a party to the original agreement between the City and Cinevision. That ruling is not on appeal.

The complaint also included pendent state law contract claims. The district court severed those claims, which are now the subject of proceedings in the California courts. That ruling also is not on appeal.

**3.** In making its first amendment arguments, the City does not suggest that, by entering into a contract that allowed the City Council the "final and conclusive" decision about approving or disapproving the proposed concerts, Cinevision waived its first amendment rights. Nor does the City rely on any contention that it had a contractual right to reject the six concerts or that any such contractual right could override Cinevision's constitutional interest.

amendment right to promote concerts.[4] We disagree.

The Supreme Court has consistently held that expression beyond that of pure speech is protected by the first amendment.[5] "Entertainment, as well as political and ideological speech, is protected; motion pictures, programs broadcast by radio and television, and live entertainment, such as musical and dramatic works, fall within the First Amendment guarantee." *Schad v. Borough of Mt. Ephraim,* 452 U.S. 61, 65, 101 S.Ct. 2176, 2180, 68 L.Ed.2d 671 (1981) (nude dancing).[6] Other circuits and district courts presented with the issue have held, and we agree, that music is a form of expression that is protected by the first amendment.[7] Therefore, "[i]f the [City Council] passed an ordinance forbidding

the playing of rock and roll music ..., they would be infringing a First Amendment right ... even if the music had no political message—even if it had no words—and the defendants would have to produce a strong justification for thus repressing a form of 'speech.'" *Reed v. Village of Shorewood,* 704 F.2d 943, 950 (7th Cir.1983) (citations omitted).

The City suggests that because Cinevision does not seek to "express" its views, it has no first amendment right to promote concerts *for profit.* However, even though concert promoters generally promote concerts for profit, they still enjoy the protections of the first amendment. *See, e.g., Joseph Burstyn, Inc. v. Wilson,* 343 U.S. 495, 501–02, 72 S.Ct. 777, 780–81,

---

4. The City claims that the following jury instruction was in error:

> The First Amendment protection of the freedom of speech includes protection of the freedom of artistic expression, whether it be in books, pictures, paintings, plays or concerts, and this right to freedom of artistic expression is entitled to the same serious consideration that you would give to a claim that a book or newspaper had been censored.... *As it pertains to this case the First Amendment right of artistic expression also includes the right to hire groups or performers to appear at a concert.*

(emphasis added). The instructions also placed limitations on Cinevision's first amendment rights:

> [S]peech or expression may be restrained where there is a legitimate expectation that the performances proposed by plaintiff Cinevision may cause a potential public nuisance or violation of state law or municipal ordinance.... If the defendants acted within the limits of their lawful authority in accordance with narrow, objective and definite standards for reaching their conclusions and denying plaintiff's request, then the defendants could not have deprived the plaintiff Cinevision of any guaranteed right of freedom of expression.

To the extent that the instructions were less favorable to the City than it desired, they were not in error. Accordingly, we need not decide whether the City objected with particularity to the proposed jury instruction as required by Fed.R.Civ.P. 51, or whether the objections were waived, *see Harmsen v. Smith,* 693 F.2d 932, 939 (9th Cir.1982). We recognize, however, that if any error in the instructions occurred, it is that they were not protective enough of Cinevision's first amendment rights. *See infra.*

5. *See, e.g., Spence v. Washington,* 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974) (affixing a peace symbol to a flag); *Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969) (marching); *Tinker v. Des Moines School District,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (wearing armbands); *Edwards v. South Carolina,* 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963) (demonstrating); *Thornhill v. Alabama,* 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940) (labor picketing); *Schneider v. State (Town of Irvington),* 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 185 (1939) (distributing handbills).

6. *See, e.g., Young v. American Mini-Theatres,* 427 U.S. 50, 61, 96 S.Ct. 2440, 2447, 49 L.Ed.2d 310 (1976) (plurality opinion) (adult films); *Winters v. New York,* 333 U.S. 507, 510, 68 S.Ct. 665, 667, 92 L.Ed. 840 (1948) (magazine stories of "bloodshed" and "lust"); *Tovar v. Billmeyer,* 721 F.2d 1260, 1264 n. 4 (9th Cir.1983) (adult bookstore and theater).

7. *See Reed v. Village of Shorewood,* 704 F.2d 943, 950 (7th Cir.1983); *Tacynec v. City of Philadelphia,* 687 F.2d 793, 796 (3d Cir.1982), *cert. denied,* 459 U.S. 1172, 103 S.Ct. 819, 74 L.Ed.2d 1016 (1983); *Goldstein v. Town of Nantucket,* 477 F.Supp. 606, 608 (D.Mass.1979); *see also Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 557–58, 95 S.Ct. 1239, 1245–46, 43 L.Ed.2d 448 (1975) ("By its nature, theater usually is the acting out—or singing out—of the written word, and frequently mixes speech with live action or conduct. But that is no reason to hold theater subject to a drastically different [first amendment] standard.").

96 L.Ed. 1098 (1952). In fact, promoters of theatrical productions and concerts have previously succeeded in challenging a municipality's denial of access to governmentally owned property. *See Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975); *Fact Concerts, Inc. v. City of Newport,* 626 F.2d 1060, 1063 (1st Cir.1980), *rev'd on other grounds,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981). Thus, under the first amendment, there clearly are rights to promote protected expression for profit—including musical expression. As a promoter of protected musical expression, Cinevision enjoys first amendment rights.

There are sound reasons for recognizing the first amendment rights of concert promoters. Allowing a concert promoter to vindicate the rights of persons to engage in musical expression furthers a crucial first amendment value. As Justice Powell has stated,

> Our cases reveal ... that the central concern of the First Amendment in this area is that there be a free flow from creator to audience of whatever message a film or a book might convey.... *In many instances, ... it is only the theater owner or the bookseller who can protect this interest. But the central First Amendment concern remains the need to maintain free access of the public to the expression.*

*Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 77, 96 S.Ct. 2440, 2455, 49 L.Ed.2d 310 (1976) (Powell, J., concurring) (emphasis added).

■ The same first amendment value—the right of public access to protected expression—is at stake here. *See, e.g., Board of Education (Island Trees) v. Pico,* 457 U.S. 853, 866–67, 102 S.Ct. 2799, 2807–08, 73 L.Ed.2d 435 (1982) (plurality opinion); *Stanley v. Georgia,* 394 U.S. 557, 564, 89 S.Ct. 1243, 1247, 22 L.Ed.2d 542 (1969). To have access to live musical expression, the public must necessarily rely on concert promoters to make arrangements for musicians to perform. The role of the promoter in ensuring access to the public is at least

as critical as the role of the bookseller or theater owner: in fact, it would seem to be far easier for an individual to obtain printed material or a film on his or her own than to arrange personally for live entertainment by a nationally known musical group. Thus, a concert promoter, like a bookseller or theater owner, is a type of "clearinghouse" for expression. Moreover, as a practical matter, a promoter, like Cinevision, is in a far better position than concertgoers or individual performers to vindicate first amendment rights, and ensure public access to live musical entertainment.

■ The City's argument that Cinevision enjoyed no first amendment right to promote the six rejected concerts is based in large part on the fact that an executive officer of Cinevision did not know specifically what songs each performer would sing; therefore, the City argues, Cinevision, by promoting the concerts was not engaging in "expression" protected by the first amendment. As we have noted, however, theater owners and booksellers, even if they are not "expressing" themselves, further a first amendment interest in making protected materials available to the public. Moreover, it would be anomalous to require a promoter to know exactly what songs an entertainer will sing before any first amendment rights attach—just as it would be to require a bookseller to read all of the books he plans to sell or a theater owner to view all of the movies he intends to show. In fact, not even the City Council members knew the songs that each proposed performer would sing. Rather than objecting to any particular songs, various Council members objected to certain types of music, labelling all music of which they disapproved as "hard rock."

We recognize, as the Council members obviously did, that the musical expression of some performers reflects a particular political view and that some performers may, apart from their music, represent a particular ideology or way of life. However unsophisticated or ill-informed the members of the City Council may have been regarding current forms of popular

music, it is difficult to believe that they would not have been aware of the differences between Jackson Browne and Donnie and Marie Osmond, or the differences between Pete Seeger and Pat Boone, or Joan Baez and Merle Haggard. It is hardly necessary to know what specific songs these artists will sing in order to know that their very appearances carry differing political or social messages.

■ In any event, constitutional safeguards are not applicable only to musical expression that implicates some sort of ideological content. Rather, all—political and non-political—musical expression, like other forms of entertainment, is a matter of first amendment concern. Consequently, promoters of musical expression of all types enjoy the protections of the first amendment.

We hold that live musical expression is protected by the first amendment. We also hold that Cinevision enjoyed a first amendment right to promote concerts.

### B. *The Starlight Bowl as a Public Forum*

■ Governmental regulation of a place determined to be a public forum is limited by the constraints of the first amendment. *See generally* Kalven, *The Concept of the Public Forum: Cox v. Louisiana,* 1965 S.Ct.Rev. 1 (discussing the development of the public forum doctrine). A common example of a public forum is "a municipal theater dedicated to performances for the local population." L. Tribe, *American Constitutional Law* § 12–21, at 690 (1978). The City argues that the Starlight Bowl is not a public forum and therefore it is not limited by the first amendment in regulating access to the Bowl. We disagree.

■ In *Perry Education Association v. Perry Local Educators' Association,* 460 U.S. 37, 44, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983), the Supreme Court described three types of public forums with public access rights that vary "depending on the character of the property at issue." The first category includes those "quintessential public forums," such as streets and parks, "which by long tradition or by government fiat have been devoted to assembly and debate." *Id.* at 45, 103 S.Ct. at 954. In these forums,

> the government may not prohibit all communicative activity. For the state to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end.... The state may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.

*Id.* (citations omitted). Moreover, in formulating a content-based or a time, place, and manner regulation, government must select the means of furthering its interest that is least restrictive of first amendment rights. *See, e.g., United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968); L. Tribe, *supra,* at 682–88 (discussing Supreme Court cases).

■ The second public forum category includes:

> public property which the state has opened for use by the public as a place for expressive activity. The Constitution forbids a state to enforce certain exclusions from a forum generally open to the public even if it was not required to create the forum in the first place.... Although a state is not required to indefinitely retain the open character of the facility, as long as it does so it is bound by the same standards as apply in a traditional public forum.

*Perry Education Association,* 460 U.S. at 45–46, 103 S.Ct. at 954–955 (citations omitted). Thus the identical broad free speech rights attach to the first and second types of public forums.[8]

---

8. Narrower access rights attach to the third public forum category. This category consists of public property, such as a military base or jail, "which is not by tradition or designation a fo-

*Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975), cited in *Perry Education Association* as an example of the second type of public forum, involved facts similar to the ones before us. In that case, the Court held that the members of a municipal board abridged the first amendment rights of a promoter of theatrical productions in denying the promoter access to a municipal facility for the presentation of the controversial rock musical "Hair." The city board, allegedly guided by a "best interest of the community" standard, denied the application for use of the facility on the basis of "outside reports that the musical, as produced elsewhere, involved nudity and obscenity." 420 U.S. at 548, 95 S.Ct. at 1241. As here, the City "did not permit the show to go on and rely on law enforcement authorities to prosecute for anything illegal that occurred .... [but] denied the application in anticipation that the production would violate the law." *Id.* at 555, 95 S.Ct. at 1244 (citation omitted). The Court held that the rejection of the application amounted to a prior restraint on expression. *Id.* at 552, 95 S.Ct. at 1243.

 Like the municipal auditorium in *Southeastern Promotions,* the Starlight Bowl falls clearly within the second public

forum category. As the City correctly points out, public ownership of the Bowl does not compel the conclusion that it is a public forum. *See United States Postal Service v. Council of Greenburgh Civic Associations,* 453 U.S. 114, 129, 101 S.Ct. 2676, 2685, 69 L.Ed.2d 517 (1981); *Hague v. Committee for Industrial Organization,* 307 U.S. 496, 515, 59 S.Ct. 954, 963, 83 L.Ed. 1423 (1939) (Roberts, J.). However, by granting Cinevision access to the Bowl for the presentation of music by a variety of performers, the City transformed publicly owned property into a public forum for expressive activity, even if the expressive activity is promoted by a single entity. Moreover, assuming that, as the City claims, the Starlight Bowl is "remote, fenced, seldom used, and locked when not in use," that does not affect its status as a public forum; the auditorium in dispute in *Southeastern Promotions* was similar in most respects.[9]

We hold that, for purposes of the first amendment, the Starlight Bowl is a public forum. Accordingly, as in the case of other "public property which the state has opened for use by the public as a place for expressive activity," the same free speech rights that apply to streets, parks, or other

---

rum for public communication." *Perry Education Association,* 460 U.S. at 46, 103 S.Ct. at 955. *See, e.g., Greer v. Spock,* 424 U.S. 828, 94 S.Ct. 1211, 47 L.Ed.2d 505 (1976) (military base); *Adderley v. Florida,* 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966) (county jail); *United States v. Albertini,* 710 F.2d 1410 (9th Cir.1983) (military base). For this category of public forum, "[i]n addition to time, place, and manner regulations, the state may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry Education Association,* 460 U.S. at 46, 103 S.Ct. at 955 (citation omitted).

9. Although it involved similar facts, the Supreme Court's decision in *Southeastern Promotions* does not address nor resolve the issues before us. In *Southeastern Promotions,* the rock musical "Hair" was treated as obscene by the municipal board and the courts. The Supreme Court did not consider the merits of the obscenity question but held that the City had

not adopted a procedure affording the type of judicial review necessary to support a lawful prior restraint of expression. *See Southeastern Promotions,* 420 U.S. at 560, 95 S.Ct. at 1247 (reiterating the stringent procedural requirements for a valid prior restraint of obscenity set forth in *Freedman v. Maryland,* 380 U.S. 51, 58, 85 S.Ct. 734, 738, 13 L.Ed.2d 649 (1965)).

Here, we are not faced with any claims that the proposed concerts would have been obscene in any way. In fact, the proposed concerts almost certainly did not fall into any category of unprotected expression. Whether or not procedural safeguards similar to those required in obscenity cases must be adopted whenever governmental entities propose to grant or withhold approval of performances to be given in public forums, is an interesting but heretofore unconsidered question. Neither party has argued or briefed the issue. Accordingly, we do not decide whether Cinevision's claims could be disposed of on grounds similar to those utilized by the Supreme Court in *Southeastern Promotions.*

"quintessential" public forums apply to the Starlight Bowl.

### C. Exclusion of the Proposed Entertainers from a Public Forum

1. Banning Particular Forms of Expression Because of Disapproval of Content

 We now turn to the question whether the City constitutionally rejected Cinevision's proposed concerts. Although the City was not required to open the Starlight Bowl and is not required to leave it open indefinitely, it cannot, absent a compelling governmental interest, open the forum to some and close it to others solely in order to suppress the content of protected expression.[10] Generally, "[s]elective exclusions from a public forum may not be based on content alone, and may not be justified by reference to content alone." Police Department of Chicago v. Mosley, 408 U.S. 92, 96, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972) (footnote omitted).[11] In any event, any content-based regulation that is justified by a compelling state interest also must be narrowly drawn and must constitute the least restrictive means of furthering the governmental interest.

 Here, although the prohibitions against the concerts are content-related, there are neither compelling state interests that justify the City's denial of access to the Starlight Bowl, nor narrowly drawn standards designed to prevent arbitrary decision-making. See Perry Education Association, 460 U.S. at 45–46, 103 S.Ct. at 954–955 (citation omitted). The contract involved in this case provides an overbroad standard for the City Council's disapproval of the proposed concerts: a proposal may be disapproved if it has "the potential of creating a public nuisance or ... would violate any State law or City ordinance." (emphasis added).[12] That standard does not adequately limit the discretion of the City Council in approving or disapproving the proposals. Thus, it fails to meet the requirements of the first amendment. See Board of Education (Island Trees) v. Pico, 457 U.S. 853, 864–65, 102 S.Ct. 2799, 2806–07, 73 L.Ed.2d 435 (1982) (plurality opinion). Moreover, almost all of the expressed objections to the proposed concerts centered on the content of the music—it was "hard rock" music that the City Council wanted to exclude from the Starlight Bowl.[13] The City of Burbank has demonstrated no com-

10. However, as we discuss infra, the content of expression may be a legitimate factor to consider when the City is seeking to promote, rather than to suppress, certain forms of expression.

11. See, e.g., Widmar v. Vincent, 454 U.S. 263, 267–70, 277, 102 S.Ct. 269, 273–74, 278, 70 L.Ed.2d 440 (1981); City of Madison Joint School District No. 8 v. Wisconsin Employment Relations Commission, 429 U.S. 167, 176, 97 S.Ct. 421, 426, 50 L.Ed.2d 376 (1976); Erznoznik v. City of Jacksonville, 422 U.S. 205, 209, 95 S.Ct. 2268, 2272, 45 L.Ed.2d 125 (1975).

Mosley struck down a municipal ordinance that provided for differing types of treatment of protected speech on the basis of its content. The Court held that the ordinance violated the equal protection clause of the 14th amendment. See Stone, Fora Americana: Speech in Public Places, 1974 S.Ct.Rev. 233, 272–80 (discussing Mosley and equal protection challenges to selective exclusion from a public forum). The quoted language, however, applies to both the equal protection clause and the first amendment. Because we hold that the City violated Cinevision's first amendment rights, we need not decide whether the City's exclusion of "hard rock" mu-

sic from the Starlight Bowl also violated the equal protection clause.

12. Although the breach of contract claims are not before us, see supra note 2, we recognize that the City Council appears not to have properly applied the standard for disapproving concerts that it placed in the agreement. At least, the jury apparently so found: it rendered its verdict in favor of plaintiffs after being instructed that the City had a right to reject the proposals if "there [were] a legitimate expectation that the [proposals] may cause a potential public nuisance or violation of state law or municipal ordinance."

13. The City Council's definition of "hard rock" music bears little resemblance to the definition accepted by listeners of modern music or by those involved in the music industry. We recognize, however, that "hard rock" is difficult to define. Even assuming that the Council's definition coincided with the generally accepted definition, "hard rock" is not a narrowly drawn or clearly defined category that can withstand constitutional scrutiny. See infra p. 575.

pelling state interest to justify its content-based suppression of protected musical expression.

■ The discussions at the City Council meetings reveal that some council members felt that all "hard rock" concerts are a public nuisance. A label such as public nuisance may not lightly be applied in the case of first amendment activity. "We do not question the [City's] right to regulate certain nuisances within its boundaries; what we are concerned with is 'the consequences for constitutionally protected speech' in the [City's] efforts." *J–R Distributors, Inc. v. Eikenberry*, 725 F.2d 482, 494 (9th Cir.1984) (quoting *Marcus v. A Search Warrant of Property*, 367 U.S. 717, 731, 81 S.Ct. 1708, 1715, 6 L.Ed.2d 1127 (1961)). Given the evidence before us, we must reject the City of Burbank's suggestion that "hard rock" concerts are a *per se* public nuisance justifying their exclusion from the Starlight Bowl because of their content. *See Erznoznik v. City of Jacksonville*, 422 U.S. 205, 208, 95 S.Ct. 2268, 2272, 45 L.Ed.2d 125 (1975) (rejecting on first amendment grounds the City's argument "that any movie containing nudity which is visible from a public place may be suppressed as a nuisance").

■ In addition, a general fear that state or local narcotics or other laws will be broken by people attending the concerts cannot justify a content-based restriction on expression. *See, e.g., Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 555, 95 S.Ct. 1239, 1244, 43 L.Ed.2d 448 (1975); *Gay Students Organization v. Bonner*, 509 F.2d 652, 662 (1st Cir.1974). "[I]n our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 508, 89 S.Ct. 733, 737, 21 L.Ed.2d 731 (1969). Normally, law enforcement officers can deal adequately and effectively with unlawful activity of that nature at the time it occurs. That is a proper exercise of

the police power; censorship is not. Even if the performers planned to advocate unlawful, subversive activities, which the City has not alleged here, that expression could only be suppressed if it were directed at producing, and were likely to produce, imminent lawless action. *See, e.g., Brandenburg v. Ohio*, 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430 (1969).

Moreover, there is reason to question the extent to which any good faith concern over problems relating to law enforcement (irrelevant as those concerns may be for purposes of the first amendment) played a serious part in the Council's determinations. The facts surrounding the Todd Rundgren concert illustrate this point. Even though the members of the Police Commission who made a recommendation concerning the proposed concert suggested that the City Council approve the concert, the Council disapproved it. The pre-concert investigation report prepared by the Police Department expressly stated that there had been "no problems" at any of Rundgren's concerts in other cities. In fact, in 1976, Todd Rundgren performed in the Starlight Bowl and, according to the Chief of Police, there were no security or traffic congestion problems; "[t]he crowd, for the most part, was orderly, and there were no citizen complaints." Similarly, although there was no evidence whatsoever that there had been any problems at his previous concerts, the City Council rejected a proposed Jackson Browne concert.[14]

■ We recognize, of course, that a municipality may have legitimate concerns about the collateral effects of concerts in an amphitheater like the Starlight Bowl: a municipality has a significant interest in controlling the noise level of a concert, crowd overflow, and traffic congestion. For that reason, content-neutral time, place, and manner regulations that are narrowly drafted to further such significant governmental interests do not violate the first amendment. *See, e.g., United States*

---

**14.** We discuss *infra* the arbitrary factors on which the Council relied in rejecting the Jackson Browne concert, as well as other proposed events.

*Postal Service v. Council of Greenburgh,* 453 U.S. 114, 132, 101 S.Ct. 2676, 2686, 69 L.Ed.2d 517 (1981); *Grayned v. City of Rockford,* 408 U.S. 104, 115, 92 S.Ct. 2294, 2302, 33 L.Ed.2d 222 (1972). For example, a City may under some circumstances regulate the decibel level of concerts or place time restrictions on concerts when music is performed above a certain volume. However, there are no time, place, or manner regulations involved here.

## 2. *Dedicating a Public Facility to Particular Forms of Expression.*

■ In addition to voicing the generalized objections to "hard rock" music, some City Council members expressed an affirmative desire to provide the citizens of Burbank with a diversity of entertainment in the Starlight Bowl. We could well understand such a desire, which on its face is both legitimate and laudable. However, rather than simply acting positively to promote diverse entertainment, the City Council deliberately and purposefully excluded from the Bowl all performers who played a particular type of music deemed unacceptable by the City Council. This fact, as well as the Council's reliance on additional arbitrary factors and its failure to adopt or apply appropriate standards limiting its discretion, renders its actions violative of the first amendment. *See, e.g., Board of Education (Island Trees) v. Pico,* 457 U.S. 853, 864–65, 102 S.Ct. 2799, 2806–07, 73 L.Ed.2d 435 (1982) (plurality opinion); *United States Postal Service v. Council of Greenburgh Civic Associations,* 453 U.S. at 130–31, 101 S.Ct. at 2685–86.[15]

■ Some City Council members also expressed a desire to inculcate the "proper" community values in its youth by presenting only "family entertainment" in the Starlight Bowl. The desire to inculcate Americanism or "proper" community val-

ues in its youth cannot justify Burbank's efforts to ban "hard rock" music from the Starlight Bowl. The first amendment limits governmental efforts to inculcate values, at least when such efforts serve to suppress or stifle other forms of protected expression. *See Board of Education (Island Trees) v. Pico,* 457 U.S. 853, 872, 101 S.Ct. 2799, 2810, 73 L.Ed.2d 435 (1982) (plurality opinion) (limiting city's power to remove books from school library for partisan reasons in an effort to inculcate community values); *West Virginia Board of Education v. Barnette,* 319 U.S. 624, 642, 63 S.Ct. 1178, 1187, 87 L.Ed. 1628 (1943) (holding that board of education cannot force students to salute the flag).

■ In addition, the City Council did not make clear precisely what values the presentation of "family entertainment" would inculcate, or how "hard rock" music corrupts those values. The term "family entertainment" does not, in itself, provide a standard sufficient to limit arbitrary and capricious action by the Council. Rather, the term is just as vague, and has the same potential for abuse as the "best interest of the community" standard used by the city board in *Southeastern Promotions.* Subjective assertions about "proper" community values and amorphous concerns over intangible harms caused by "hard rock" music cannot justify the City's engaging in content-based decision-making.

Despite our holding that the City violated Cinevision's first amendment rights, we do not mean to suggest that a municipality that wishes to dedicate a facility to the promotion of drama or opera is powerless to do so, or that a governmental entity can never regulate access to a forum on the basis of the type of entertainment to be presented. The dedication of a museum to the exhibition of contemporary art, a theater to the production of Shakespeare's

15. By reserving some dates in the contract with Cinevision for performances by the opera, symphony, and choral club, the City did attempt, properly, to ensure some diversity in the entertainment in the Starlight Bowl. *See infra* p. 575. However, the City Council's disapproval of the proposed concerts was not based on a desire

to limit the number of "hard rock" concerts so as to assure a reasonable mix of performances. In fact, the Council would have been precluded by its contract with Cinevision from disapproving concerts for that reason; the Council, naturally, does not contend that it breached the contract.

works or the performance of plays intended for children, or an auditorium to ballet or other forms of dance, may in some instances encourage a diversity of entertainment and promote, rather than abridge, first amendment values. *See* L. Tribe, *supra*, § 12–21, at 690 n. 12. While the case before us involves an effort to suppress a particular type of entertainment, the *bona fide* dedication of a forum to a specialized form of "speech" represents a positive act by the government. Ordinarily, the purpose of such an act is to support a form of expression that is not sufficiently available to the public, usually because sufficient exposure cannot readily be obtained for such expression through non-governmental means. Although questions concerning the lawfulness of such affirmative governmental actions have previously been raised, they have never been conclusively resolved. *See Southeastern Promotions*, 420 U.S. at 572–73, 95 S.Ct. at 1253–54 (Rehnquist, J., dissenting) ("May a [municipally owned] opera house limit its productions to operas, or must it also show rock musicals? May a municipal theater devote an entire season to Shakespeare, or is it required to book any potential production on a first come, first served basis?"); Karst, *Public Enterprise and the Public Forum: A Comment on* Southeastern Promotions, Ltd. v. Conrad, 37 Ohio St.L.J. 247, 259 (1976).[16]

In our view, the content-based decision making that is required when government dedicates a public forum to particular types of expression does not necessarily violate the first amendment.[17] In fact, government must make similar content-based distinctions in regulating expression in schools, libraries, and museums, or in subsidizing the arts. *See, e.g., Board of Education (Island Trees) v. Pico*, 457 U.S. 853, 869, 102 S.Ct. 2799, 2809, 73 L.Ed.2d 435 (1982) (plurality opinion) (school libraries); *Advocates for Arts v. Thomson*, 532 F.2d 792 (1st Cir.) (state council can discriminate on basis of content in allocating grants that are designed to promote art), *cert. denied*, 429 U.S. 894, 97 S.Ct. 254, 50 L.Ed.2d 177 (1976); *Presidents Council District 25 v. Community School Board No. 25*, 457 F.2d 289, 291–92 (2d Cir.) (in selecting books for a public school library, "evidently some authorized person or body has to make a determination as to what the library collection will be"), *cert. denied*, 409 U.S. 998, 93 S.Ct. 308, 34 L.Ed.2d 260 (1972). In addition, the government's involvement in the editorial decisionmaking process in public broadcast-

---

16. In *Southeastern Promotions,* the municipality did not act to promote any specialized form of "expression." Rather than dedicating a forum to a particular form of expression or acting in a positive manner to promote first amendment values in any way, the City of Chatanooga

> put forward [the theater] as available for plays generally, and permission to produce the musical "Hair" on its stage was denied on the sole ground that the production would not be "in the best interest of the community." ... Having opened a public forum ostensibly as a "common meeting place ... for ... entertainment," ... Chattanooga was not free selectively to deny permission to use that forum on the basis of a production's content.

L. Tribe, *supra*, § 12–21, at 690 n. 12 (citations omitted). Thus, the Supreme Court in *Southeastern Promotions* did not discuss the constitutionality of a municipality's dedication of a public forum to the presentation of a particular form of expression.

17. One commentator has argued that:

> If [a city] wants to be the proprietor of a concert hall or a repertory playhouse, as many cities are, it can do so without turning these halls into general purpose municipal auditoriums that are commanded by the first amendment to avoid content regulation. But these places, too, will be public forums. Discretionary content regulation will be permissible, so long as it is limited to high-quality concerts and the playhouse devoted to good theater. But when government is the proprietor of any forum, it is constitutionally permitted to regulate speech content only to the degree necessary to further such a compelling state interest.

Karst, *Public Enterprise and the Public Forum: A Comment on* Southeastern Promotions, Ltd. v. Conrad, 37 Ohio St.L.J. 247, 259 (1976) (footnotes omitted). Although we agree with much of what Professor Karst says, we recognize that discretion unbridled by narrowly drawn standards would not satisfy the requirements of the first amendment. We are far from certain that governmental officials can or should be trusted with the judgment of what constitutes "high-quality concerts" or "good theater."

ing, which by definition is based on content, does not alone violate the first amendment. *See Muir v. Alabama Educational Television Commission,* 688 F.2d 1033, 1043–47 (5th Cir.1982) (en banc), *cert. denied,* 460 U.S. 1023, 103 S.Ct. 1274, 75 L.Ed.2d 495 (1983); Canby, *The First Amendment and the State as Editor: Implications for Public Broadcasting,* 52 Tex.L.Rev. 1123, 1148–65 (1974).[18]

■■■■ A court must, however, scrutinize closely a government's dedication of a forum to a particular type of expression and fully consider a number of factors before deciding the constitutionality of such an action. *See* Shiffrin, *Government Speech,* 27 UCLA L.Rev. 565, 570, 584–88, 610, 640–43 (1980); Kamenshine, *The First Amendment's Implied Political Establishment Clause,* 67 Calif.L.Rev. 1104, 1110–13 (1979). Cass, *First Amendment Access to Government Facilities,* 65 Va.L. Rev. 1287, 1354–55 (1979); Note, *Content Regulation and the Dimension of Free Expression,* 96 Harv.L.Rev. 1855, 1872 n. 97 (1983). As a threshold matter, the court is required to review with particular care any claim that the governmental body is actually attempting to suppress controversial, political, or other forms of expression, rather than attempting to promote certain limited forms of entertainment. Any willful or purposeful effort by a municipality to suppress protected expression clearly conflicts with the first amendment.

■■■■ Once it is clearly established that the purpose of the conduct is not to suppress protected expression, the reviewing court should consider the category of expression that a municipality has dedicated the use of a public forum to, how that category is defined, and what standards will be used to determine whether particular performances or works fall within that category. The exclusive use of an auditorium or theater for a form of expression that is well defined, historically recognized, readily identifiable, and susceptible to objective classification is likely to be found permissible. Opera or ballet are examples of types of entertainment that satisfy those criteria. In addition, categories of expression that are specific in nature and are constant, unchanging and fixed, such as the plays of Shakespeare, or the works of 19th century French dramatists, would not be likely to give rise to first amendment problems. Such categories, like the others we have mentioned, constitute a form of expression that may be defined by means of a clear, precisely drawn, objective standard. However, the more subjective the standard used, the more likely that the category will not meet the requirements of the first amendment; for, when guided only by subjective, amorphous standards, government officials retain the unbridled discretion over expression that is condemned by the first amendment.

■■■■ The way in which a public forum dedicated to a certain form of expression is operated may also be significant in determining the constitutionality of the limitation. When decisions about what forms of expression will be permitted or which individuals will be allowed to express themselves in a public forum are made by a political body like the City Council, those decisions must be scrutinized most carefully—if only because such a body is at all times, by its very nature, the object of political pressures. Regrettably, at times the will of the majority may for the moment run contrary to the protections that the first amendment affords political and other controversial forms of expression. To the extent the decision-maker is removed from the heat of the political process, or is free to make an independent judgment, the constitutional problem is less acute. For example, the selection of exhibits by a professionally trained museum curator is far less likely to result in first

---

**18.** *See also Lehman v. City of Shaker Heights,* 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974) (plurality opinion) (holding that city may exclude political advertisements on city owned buses); *Wooley v. Maynard,* 430 U.S. 705, 717, 97 S.Ct. 1428, 1437, 51 L.Ed.2d 752 (1977) (recognizing that state has legitimate interest in "seeking to communicate to others an official view as to proper appreciation of history, state pride, and individualism").

amendment questions then the veto of proposed museum exhibits by a group of local elected officials. Similarly, a decision by a professional concert promoter, or even a civil service employee with particular training or expertise in the field of entertainment or facilities management, will have a better chance of surviving first amendment scrutiny than a similar decision made by a mayor or other elected officials.

 Another relevant factor in determining whether a public forum may be devoted exclusively to one form of expression is whether other forums are available for the presentation of that form of expression. The fact that there are few, if any, alternative forums for a particular form of expression would tend to support the constitutionality of the municipality's action; restricting the use of the forum would under those circumstances provide the public with access to expression that it would not otherwise have.[19] As we have emphasized, such governmental conduct furthers, rather than inhibits, crucial first amendment values.

 Finally, the nature of the previous use of a forum may also be a relevant consideration. Specifically, if a facility was previously open to various forms of expression but access is then limited so that certain forms may no longer be performed or exhibited, the argument that the municipality intends to suppress, rather than to promote, expression may under some circumstances be stronger.

In summary, we believe that the dedication of a forum to a certain type of expression does not necessarily violate the first amendment. To the contrary, in some instances, such a practice can promote first amendment interests. However, for the reasons that we have given, *see supra* pp. 571–573, we conclude that the City of Burbank's actions here do not meet the strict constitutional standard applicable in such cases.

3. *Consideration of Arbitrary and Unlawful Factors*

 The City Council also considered arbitrary and unlawful factors in disapproving the proposed concerts. Discussion at the City Council meeting indicated that Todd Rundgren and Patti Smith were rejected—at least in part—because members of the Council thought that their performances would attract homosexual crowds. Councilman Richman explicitly stated that Rundgren and Smith attracted homosexual crowds and "that's not what we want."[20] The only "evidence" supporting that assertion was a Burbank police report indicating that a police department in another city where Rundgren and Smith had performed apparently stated that a large number of homosexuals had attended the concerts.

Other arbitrary factors were considered by the Council in rejecting some of the proposed concerts. For example, Richman in the past had indicated opposition to performers who attracted "black audiences."

---

**19.** Of course, the City may not exclude proposed entertainers from a generally open, all purpose public forum simply because there may be alternative forums where they could perform. *See United States v. Grace,* 461 U.S. 171, 103 S.Ct. 1702, 1707, 75 L.Ed.2d 736 (1983); *Southeastern Promotions,* 420 U.S. at 556, 95 S.Ct. at 1245; *Schneider v. State (Town of Irvington),* 308 U.S. 147, 163, 60 S.Ct. 146, 151, 84 L.Ed. 155 (1939).

**20.** There is other evidence of anti-homosexual sentiment on the part of the City Council. In a letter to a local pastor in August 1979, the Mayor of Burbank, a voting member of the City Council, wrote the following about homosexuals:

I believe that we in Burbank are fortunate that we have been able to avoid the open

recognition of these sick people and while I am certain that such people do exist within our community, our moral standards are still such that they do not openly flaunt their position. It is my firm belief that these standards will continue and that we will be able to avoid forever into the future the kinds of confrontation which regularly occur in cities such as San Francisco and others.

Similarly, Councilman Richman stated in a letter to the same pastor that "having concerts at the Starlight Bowl ... will bring to Burbank the dopers and sexual misfits of Los Angeles into direct contact with the youths of Burbank ... I hope you will also ask your fellow ministers, priests, and rabbis to join with you in this morality fight."

*See infra* note 25. The vice-mayor objected to Patti Smith's proposed concert because she often said "off-the-wall things." Finally, the discussion at the City Council meeting strongly suggests that the proposed Jackson Browne concert was rejected solely because of Browne's views, and the views of the crowd that he would attract, on nuclear power.

 The record before us leaves little room for any argument by the City of Burbank that the City Council rejected the proposed groups on constitutionally permissible grounds. Excluding a performer because of his political views, or those of the crowd that he might attract, or because the performer might say unorthodox things, as well as considering such arbitrary factors as the lifestyle or race of the crowd that a performer would attract, is not constitutionally permissible.

 Moreover, there were no consistent content-neutral standards used to evaluate the proposed entertainers; rather, the City Council rejected groups with both favorable and unfavorable police reports. The only standard consistently applied is that performers who played what the members of the Burbank City Council thought to be "hard rock" music or who were perceived by the officials to be unorthodox in the least were disapproved.

*4. Conclusion.*

We hold that the City of Burbank violated Cinevision's first amendment rights in denying access to the Starlight Bowl on the basis of the content of the performers' expression and other arbitrary factors.

## II. IMMUNITY OF COUNCILMAN RICHMAN

 Councilman James Richman argues that, in voting to disapprove the proposed concerts, he was engaging in a legislative act and is absolutely immune from a damages award in an action under 42 U.S.C. § 1983. The district court concluded that the City Council was acting in an executive, rather than a legislative, capacity when it disapproved the proposed concerts and that Councilman Richman is therefore only entitled to qualified immunity—an immunity that protects him only if he acted in good faith. Accordingly, the district court held that the jury could, if they concluded that Richman had acted in bad faith, find him liable for damages.[21] We agree.

 We have held "that members of local legislative bodies have complete immunity from suits based on their legislative acts." *Kuzinich v. County of Santa Clara,* 689 F.2d 1345, 1349 (9th Cir.1982).[22] Although local legislators undertaking legislative acts are absolutely immune from suit, they receive less protection when performing executive acts. In *Kuzinich,* we

---

**21.** The jury held Richman jointly and severally liable with the City for compensatory damages and individually liable for punitive damages. Punitive, as well as compensatory, damages are available against individuals acting under color of state law in section 1983 actions. *E.g., Gill v. Manuel,* 488 F.2d 799, 801 (9th Cir.1973); *see White v. Washington Pub. Power Supply Sys.,* 692 F.2d 1286, 1290 (9th Cir.1982); *Bradshaw v. Zoological Soc'y,* 569 F.2d 1066, 1068 (9th Cir. 1978). We recognize that one of the reasons that the award of punitive damages is permitted in cases like this is that such awards tend to deter similar conduct by others in the future. *See City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 269–70, 101 S.Ct. 2748, 2760–61, 69 L.Ed.2d 616 (1981).

**22.** In so holding, we answered the question explicitly reserved by the Supreme Court in *Lake Country Estates, Inc. v. Tahoe Regional Planning*

*Agency,* 440 U.S. 391, 404 n. 26, 99 S.Ct. 1171, 1178 n. 26, 59 L.Ed.2d 401 (1979), which held that officials of a regional governmental body are absolutely immune from § 1983 damages claims when acting in a legislative capacity. Every other circuit addressing the question has also extended *Lake Country Estates* to provide absolute immunity to local legislators acting in a legislative capacity. *See Aitchison v. Raffiani,* 708 F.2d 96, 98–99 (3d Cir.1983); *Reed v. Village of Shorewood,* 704 F.2d 943, 952–53 (7th Cir. 1983); *Espanola Way Corp. v. Meyerson,* 690 F.2d 827, 829 (11th Cir.1982), *cert. denied,* 460 U.S. 1039, 103 S.Ct. 1431, 75 L.Ed.2d 791 (1983); *Hernandez v. City of Lafayette,* 643 F.2d 1188, 1198 (5th Cir.1981), *cert. denied,* 455 U.S. 907, 102 S.Ct. 1251, 71 L.Ed.2d 444 (1982); *Bruce v. Riddle,* 631 F.2d 272, 279 (4th Cir.1980); *Gorman Towers, Inc. v. Bogoslavsky,* 626 F.2d 607, 611–14 (8th Cir.1980).

held that the enactment of a general zoning ordinance is a legislative act and the legislators are absolutely immune from suit for voting on that ordinance; we also held that, in ordering the County Counsel to institute an action against a specific individual enforcing the general zoning ordinance, the local legislature had acted in an executive, rather than a legislative, capacity. *Id.* Because the act was executive, we held that the legislators "enjoy a qualified rather than an absolute immunity." *Id.* at 1350 (citing *Morrison v. Jones*, 607 F.2d 1269 (9th Cir.1979) (per curiam), *cert. denied*, 445 U.S. 962, 100 S.Ct. 1648, 64 L.Ed.2d 237 (1980)).[23]

■ The qualified immunity of officials acting in an executive capacity protects

them from section 1983 claims concerning good faith actions taken within the scope of their authority. *See Scheuer v. Rhodes*, 416 U.S. 232, 247–48, 94 S.Ct. 1683, 1691–92, 40 L.Ed.2d 90 (1974). In *Wood v. Strickland*, 420 U.S. 308, 322, 95 S.Ct. 992, 1000, 43 L.Ed.2d 214 (1975), the Court held that a local official acts in bad faith and "is not immune from liability for damages under § 1983 if he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate [an individual's] constitutional rights." *See e.g., Procunier v. Navarette*, 434 U.S. 555, 560, 98 S.Ct. 855, 859, 55 L.Ed.2d 24 (1978).[24] Councilman Richman does not challenge the jury's finding that he acted in bad faith.[25] Thus, for purposes

---

**23.** In *Morrison v. Jones*, 607 F.2d at 1274, we held that on the record before us local legislators who approved the appropriation of government funds to transport a juvenile to Germany to be with his grandparents were only entitled to "the qualified immunity afforded to executive officers." (citing *Scheuer v. Rhodes*, 416 U.S. 232, 247–48, 94 S.Ct. 1683, 1691–92, 40 L.Ed.2d 90 (1974)).

**24.** *Wood v. Strickland* also included a subjective test of bad faith: whether the official "took the action with the malicious intention to cause a deprivation of constitutional rights." 420 U.S. at 322, 95 S.Ct. at 1000. In *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Supreme Court scrutinized the conduct of federal executive officials and rejected the "malicious intention" part of the *Wood* test. *Harlow* held "that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 95 S.Ct. at 819 (citations omitted). Although the issue was not before it, the Court strongly suggested that the revised test would also apply to state officials sued under § 1983. *Id.* at 818 n. 30, 95 S.Ct. at 819 n. 30. In *Davis v. Scherer*, —— U.S. ——, 104 S.Ct. 3012, 3020 n. 12, 82 L.Ed.2d 139 (1984), the Supreme Court held that the objective test enunciated in *Harlow* applies to the immunity of state officials. *See Fujiwara v. Clark*, 703 F.2d 357, 359 n. 3 (9th Cir.1983) (applying the narrower *Harlow* standard in scrutinizing the conduct of state employees in a § 1983 action).

The Court in *Harlow* did not suggest whether the new test would apply to local officials. However, two Circuit Courts of Appeals have already done so. *Barnett v. Hous. Auth. of At-*

*lanta*, 707 F.2d 1571, 1581–82 (11th Cir.1983); *Saldana v. Garza*, 684 F.2d 1159, 1162–65 & n. 16 (5th Cir.1982), *cert. denied*, 460 U.S. 1012, 103 S.Ct. 1253, 75 L.Ed.2d 481 (1983).

On appeal, Richman does not challenge the jury verdict that he acted in bad faith. Accordingly, although there seems little reason to doubt that the narrower *Harlow* test applies to local legislators as well as to federal and state officials, we need not decide that question. We recognize that Richman's conduct was probably in bad faith under both the *Harlow* test and the more expansive *Wood* test because his conduct violated "clearly established ... constitutional rights of which a reasonable person would have known," *Harlow v. Fitzgerald*, 457 U.S. at 818, 102 S.Ct. at 819, *and* because he apparently acted with a malicious intent to deprive Cinevision of those rights. *See infra* note 25.

**25.** A videotape of the council meetings presents substantial evidence that Richman acted in bad faith; for example, (1) Richman alleged that two of the proposed groups would have the negative consequence of attracting homosexuals to the community; (2) Richman claimed that Jackson Browne would attract "antinuclear demonstrators" and "dopers;" and (3) Richman moved to pass a resolution to disapprove all of the proposed concerts, including those whose police reports contained no negative comments, because of their "potential for creating a public nuisance." Moreover, Councilman Richman also solicited church leaders in the community to oppose the rock concerts, and circulated a petition calling for an end to the rock concerts in the Starlight Bowl. In a letter to a constituent, Richman stated: "I shall continue to oppose the commercialization of our Starlight Bowl for the purpose of finding a home for the misfits of Los Angeles."

of resolving the immunity question, we need only decide whether Councilman Richman was acting in a legislative or an executive capacity in voting on Cinevision's proposed concerts.

Some courts attempting to distinguish executive and legislative acts by local legislators have done so by scrutinizing the scope of the act: an act that applies generally to the community is a legislative one, while an act directed at one or a few individuals is an executive one. *See Rogin v. Bensalem Township,* 616 F.2d 680, 693 & n. 60 (3d Cir.1980); *Visser v. Magnarelli,* 542 F.Supp. 1331, 1332–33 (N.D.N.Y.1982); *Three Rivers Cablevision, Inc. v. City of Pittsburgh,* 502 F.Supp. 1118, 1136 (W.D. Pa.1980); *see also Detz v. Hoover,* 539 F.Supp. 532, 534 (E.D.Pa.1982) (holding that a municipality's employment decisions are "essentially *administrative* in nature") (emphasis in original). Although this distinction may at times be useful, it does not always provide an answer to the question.[26] For instance, Congress, as well as many state and local legislatures, may enact private, or other, bills that affect an individual or a narrowly defined group of individuals. We cannot say that such activities are not legislative.

At oral argument, the City Council contended that we should adopt a clear line for separating legislative acts from the other acts of a local legislative body, *i.e.,* a legislative act is one on which the body votes. Although there is some support for, and appeal to, such a distinction, *see Espanola Way Corp. v. Meyerson,* 690 F.2d 827, 829–30 (11th Cir.1982) (citing *Hernandez v. City of Lafayette,* 643 F.2d 1188 (5th Cir. 1981)), we implicitly rejected it in *Kuzinich v. County of Santa Clara,* 689 F.2d at 1349–50, and *Morrison v. Jones,* 607 F.2d 1269 (9th Cir.1979) (per curiam), *cert. denied,* 445 U.S. 962, 100 S.Ct. 1648, 64 L.Ed.2d 237 (1980). In both those cases, we held that, although the local legislative body voted to take certain action, the body was acting in an executive capacity. The critical concern in our inquiry was the nature of the action on which the vote was taken.

In deciding whether an act is legislative, we must look at the nature of the act rather than simply at which institution acted. "Those entitled to absolute immunity have it 'because of the special nature of their responsibilities' rather than 'because of their particular location within the Government.'" *Richardson v. Koshiba,* 693 F.2d 911, 914 (9th Cir.1982) (holding that Hawaii's Judicial Selection Commission was not entitled to absolute judicial immunity) (quoting *Butz v. Economou,* 438 U.S. 478, 511, 98 S.Ct. 2894, 2913, 57

Richman's conduct prior to the 1979 season reveals other evidence of bad faith. For example, in a letter to the other members of the City Council concerning proposed entertainers for the 1977 season, Richman stated that

The O'Jays is a last-minute request by Cinevision that has not had prior Council approval. Shortly to come before us is approval for a Joe Tex concert on July 20th. The Police background will come to us in a few days and *you will note that Mr. Tex draws predominantly black audiences.* In reviewing these two groups and Sgt. Farrands' analysis, *it seems that Cinevision has changed their approach from rock concerts and kids to groups that appeal basically to blacks.* (emphasis added). Thus, Richman apparently sought to exclude black people as well as "hard rock" music, homosexuals, "dopers," and "antinuclear demonstrators" from the Starlight Bowl.

In 1978, the City Council, recognizing the extreme nature of Richman's conduct, instructed the mayor to send out a letter that stated:

In view of the actions in recent months which have been taken by a singular member of the Council whose initials are Jim Richman, the majority of the councilmen directed me to write each board and commission in the City of Burbank and to advise each of them that any letter received by any member purportedly representing the policy of the council is not to be given any credence unless the letter is signed by the Mayor and at least two additional members of the City Council.

**26.** If we were to apply this test here, we would almost certainly conclude that Richman's acts were not legislative ones. The City Council voted on each proposed group and each vote necessarily affected a specific entertainer. In no way did any of the votes resemble enactment of legislation that would be generally applicable to the community.

L.Ed.2d 895 (1978) (holding that, although employed within the executive branch, an administrative law judge is entitled to absolute judicial immunity)).[27]

For that reason, not all governmental acts by a local legislator, or even a local legislature, are necessarily legislative in nature. *Cf. Doe v. McMillan*, 412 U.S. 306, 313, 93 S.Ct. 2018, 2025, 36 L.Ed.2d 912 (1973) ("Our cases make perfectly apparent ... that everything a Member of Congress may regularly do is not a legislative act ...."); *Gravel v. United States*, 408 U.S. 606, 625, 92 S.Ct. 2614, 2627, 33 L.Ed.2d 583 (1972) ("Legislative acts [of members of Congress] are not all-encompassing."). Although a local legislator may vote on an issue, that alone does not necessarily determine that he or she was acting in a legislative capacity. Rather, "[w]hether actions ... are, in law and fact, an exercise of legislative power depends not on their form but upon 'whether they contain matter which is properly to be regarded as legislative in its character and effect.'" *INS v. Chadha*, 462 U.S. 919, 103 S.Ct. 2764, 2784, 77 L.Ed.2d 317 (1983) (discussing Congressional action) (citation omitted).[28] "The essentials of the legislative function are the determination of the legislative policy and its formulation and promulgation as a defined and binding rule of conduct." *Yakus v. United States*, 321 U.S. 414, 424, 64 S.Ct. 660, 667, 88 L.Ed. 834 (1944) (citation omitted).

Here, after considering the character and effect of the City Council's act, we conclude that, as the district court recognized, the City Council was simply monitoring and administering the contract by voting on the various proposed concerts. Administration of a municipal contract—a contract between a private party and a municipality—would generally seem to be an executive function. *Cf. Kuzinich v. County of Santa Clara*, 689 F.2d at 1350; *Morrison v. Jones*, 607 F.2d at 1272. Administration of a contract does not involve the formulation of policy "as a defined and binding rule of conduct." Rather, it is more the type of ad hoc decisionmaking engaged in by an executive.[29]

We hold that in voting to disapprove all of Cinevision's proposed concerts for the 1979 season, Councilman Richman acted in his executive, rather than legislative, capacity. He therefore enjoyed only a qualified immunity. Because the jury found that he acted in bad faith, we affirm the award of damages against Councilman Richman.

---

27. *See Supreme Court of Virginia v. Consumers Union*, 446 U.S. 719, 734, 100 S.Ct. 1967, 1975, 64 L.Ed.2d 641 (1980) (holding that the Virginia Supreme Court acted in a legislative capacity in promulgating a Code of Professional Responsibility regulating the conduct of lawyers and therefore is immune from suit); *City of Eastlake .v. Forest City Enters.*, 426 U.S. 668, 673–74, 96 S.Ct. 2358, 2362–63, 49 L.Ed.2d 132 (1976) (holding that zoning referendum is the exercise of legislative power by the people); *Hernandez v. City of Lafayette*, 643 F.2d 1188, 1193–94 (5th Cir.1981) (holding that veto of an ordinance by the mayor was a legislative act entitled to absolute immunity); *see also Buckley v. Valeo*, 424 U.S. 1, 121, 96 S.Ct. 612, 683, 46 L.Ed.2d 659 (1976) (per curiam) ("The President is a participant in the lawmaking process by virtue of his authority to veto bills enacted by Congress."); *La Abra Silver Mining Co. v. United States*, 175 U.S. 423, 453, 20 S.Ct. 168, 178, 44 L.Ed. 223 (1899) (recognizing that "the Constitution ... authoriz[es] the President to perform certain functions of a limited number that are legislative in their general nature").

28. In *Chadha*, the Supreme Court concluded that the challenged practice—a Congressional "veto" of an action taken by the Executive Branch—was unconstitutional because it did not follow the requisite procedures for enacting legislation set forth in article I of the Constitution. On that basis, the Court held that the vote of the House of Representatives, invalidating conduct of the Executive Branch, "was essentially legislative in purpose and effect." 103 S.Ct. at 2784; *see also Green v. DeCamp*, 612 F.2d 368, 371 (8th Cir.1980) ("[I]f the [state] committee exceeds legitimate legislative activity, there is no immunity for those acts which are not essential to the legislative process." (citation omitted)).

29. Because we are not presented with the issue, we need not decide whether a local legislator's vote to enter into a contract with a private party would be a legislative or an executive act.

## III. ATTORNEY'S FEES

■ Under 42 U.S.C. § 1988 (1982), a district court, "in its discretion, may allow the prevailing party [in a 42 U.S.C. § 1983 action] ... a reasonable attorney's fee as part of the costs." Here, Cinevision successfully brought a constitutional claim under 42 U.S.C. § 1983 and the district court awarded Cinevision fees.[30] "The amount of attorney's fees to be awarded the prevailing party is within the sound discretion of the trial court and will not be disturbed absent an abuse of discretion." *Rutherford v. Pitchess*, 713 F.2d 1416, 1420 (9th Cir.1983) (citation omitted); *see, e.g., Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983); *White v. City of Richmond*, 713 F.2d 458, 460 (9th Cir.1983).

The City of Burbank argues that the district court's award of attorney's fees should be vacated and remanded for further proceedings in light of the Supreme Court's subsequent decision in *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). *Hensley v. Eckerhart* held "that the extent of a plaintiff's success is a crucial factor in determining the proper amount of an award of attorney's fees under 42 U.S.C. § 1988." 103 S.Ct. at 1943. The Court also expressly recognized that when "a lawsuit consists of related claims, a plaintiff who has won substantial relief should not have his attorney's fee reduced simply because the district court did not adopt each contention raised." *Id.*

■ Here, the district court explicitly considered "the results obtained" as well as other factors required by precedent. *See, e.g., Planned Parenthood of Central & Northern Arizona v. Arizona*, 718 F.2d 938, 950–51 (9th Cir.1983); *Rutherford v. Pitchess*, 713 F.2d at 1420 & n. 1 (citing *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 69–70 (9th Cir.1975), *cert. denied*, 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976)). Thus it appears that the district

court considered the fact that the attorneys who represented Cinevision also represented Wolf & Rismiller Concerts, against whom the district court granted a directed verdict on its claims. *See supra* note 2. In any event, Cinevision's claims were essentially identical to those of Wolf & Rissmiller—they concerned the same dispute and would have required essentially the same amount of trial preparation whether or not Wolf & Rissmiller was a party.

We conclude that the district court did not abuse its discretion in awarding attorney's fees. We therefore affirm the district court's fee award.

## CONCLUSION

We conclude that Cinevision enjoys a first amendment right to promote concerts, that the Starlight Bowl is a public forum, and that the City of Burbank must act within the constraints of the first amendment in regulating access to it. We also conclude that the City of Burbank violated Cinevision's first amendment rights by disapproving Cinevision's proposed concerts on the basis of the content of the performer's expression and other arbitrary factors.

In addition, we hold that the City Council and Councilman Richman acted in an executive capacity in voting on the proposed concerts. Thus, Councilman Richman enjoyed only a qualified immunity from a damages claim under 42 U.S.C. § 1983. Because the jury found that he acted in bad faith in voting against the proposed concerts, Richman was properly held liable for both compensatory and punitive damages.

Finally, we conclude that the district court did not abuse its discretion in awarding Cinevision attorney's fees.

AFFIRMED.

SNEED, Circuit Judge, concurring:

Judge Reinhardt's opinion disposes of this case with scholarly expansiveness. It

---

30. We recognize that the district court adopted Cinevision's proposed order for attorneys' fees. Because we have emphasized that this is a disfavored practice, we must give the order "special

scrutiny." *Cher v. Forum Int'l, Ltd.*, 692 F.2d 634, 637 (9th Cir.1982) (citing Ninth Circuit cases).

provides a commentary that all who confront First Amendment issues arising from a government's regulation of access to a public forum should read. These issues, as all would agree, are often perplexing because they involve a clash of purposes, each of which enjoys some degree of legitimacy. Particularly is this true with respect to what Judge Reinhardt discusses under Part I.C.2., dedicating a public facility to a particular form of expression.

However, the case before us is clearly not exquisitely complex. Judge Reinhardt's recital of the facts makes this clear. Thus, while I recognize the value of Judge Reinhardt's opinion and the validity of all his conclusions with respect to the facts of this case, I decline to join in Part I of his opinion. I agree that Cinevision has First Amendment rights, that for the purposes of this case the Starlight Bowl was a public forum, and that the facts adequately support the jury's finding that the City of Burbank and Councilman Richman violated Cinevision's First Amendment rights. Thus, I agree with the conclusions reached in Part I.

I concur in all other portions of Judge Reinhardt's opinion.